ACCEPTED
03-17-00849-CV
21317390
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/15/2017 10:54 AM
JEFFREY D. KYLE
CLERK

No. 03-17-00849-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/15/2017 10:54:45 AM
JEFFREY D. KYLE
Clerk

# In The Court of Appeals for the Third District of Texas at Austin

*In re Richard W. Jackson and Lisa C. Jackson,*

*Relators.*

From the County Court at Law No. 1, Travis County, Texas
Trial Court Cause No. C-1-CV-17-001833

## Amended Petition for Writ of Mandamus

J. Patrick Sutton
SBOT 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903
Fax. (512) 355-4155
*jpatricksutton@
jpatricksuttonlaw.com*
Counsel for Relators

## Oral Argument Not Requested

## IDENTITY OF PARTIES AND COUNSEL

**Relators:** Richard W. Jackson and Lisa C. Jackson

**Respondent:** The Honorable Todd Wong, 1000 Guadalupe Street, Room 206, Austin, Texas 78701. Ph. (512) 854-9241.

**Real Parties In interest:** Janice Cox and Helen Ramsey

### Counsel for Relator in the appeals court:

J. Patrick Sutton
SBOT 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903 / Fax (512) 355-4155
*jpatricksutton@*
*jpatricksuttonlaw.com*

### Counsel for Relator in the trial court:

| | |
|---|---|
| J. Patrick Sutton | David M. Gottfried |
| SBOT 24058143 | State Bar of Texas No. 08231200 |
| 1706 W. 10th Street | 1505 West Sixth Street |
| Austin Texas 78703 | Austin, Texas 78703 |
| Tel. (512) 417-5903 | Tel. (512) 494-1481 |
| Fax (512) 355-4155 | Fax  (512) 472-4013 |
| *jpatricksutton@* | *david@davidgottfriedlaw.com* |
| *jpatricksuttonlaw.com* | |

### Counsel for Real Party in Interest:

Michael L. Navarre
Beatty Bangle Strama P.C.
400 West 15th Street, Suite 1450
Austin, Texas 78701
Phone: 512.879.5050 / Fax: 512.879.5040
*mnavarre@bbsfirm.com*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ....................................................................... iii

STATEMENT OF THE CASE................................................................1

STATEMENT OF JURISDICTION .........................................................1

ISSUE PRESENTED...............................................................................1

STATEMENT OF FACTS .......................................................................2

ARGUMENT ...........................................................................................4

    I.  Standard of Review .........................................................................4

    II. The Trial Court Abused Its Discretion ...........................................5

    III. The Jacksons Lack an Adequate Remedy by Appeal .....................6

    IV. Remedies Appropriate by Mandamus ...........................................7

PRAYER FOR RELIEF ..........................................................................8

RULE 52.7(a)(2) STATEMENT AS TO EVIDENCE ...............................8

RULE 52.3(j) CERTIFICATION .............................................................8

CERTIFICATE OF SERVICE.................................................................9

CERTIFICATE OF COMPLIANCE.........................................................9

APPENDIX TO PETITION FOR WRIT OF MANDAMUS ...................10

# INDEX OF AUTHORITIES

## CASES

*In re Olshan Found. Repair Co.*, 328 S.W.3d 883 (Tex. 2010) ..........4

*In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124 (Tex. 2004) ..........5

*In re Reece*, 341 S.W.3d 360 (Tex. 2011) (orig. proceeding) ...............4

*In re Team Rocket, L.P.*, 256 S.W.3d 257 (Tex. 2008).........................4

*In re United Scaffolding, Inc.*, 301 S.W.3d 661 (Tex. 2010) ..............4

*Murphy v. McDaniel*, 20 S.W.3d 873 (Tex. App. – Dallas 2000, no pet.) ..................................................................................................5

*State v. Walker*, 679 S.W.2d 484 (Tex. 1984) (orig. proceeding) ...6, 7

## STATUTES

Tex. Civ. Prac. & Rem. Code § 51.014.................................................6

## STATEMENT OF THE CASE

*Nature of the case:* In a suit to construe the meaning of restrictive covenants, the relators obtained a temporary injunction barring the real parties in interest from recording an amendment to the restrictive covenants. Months after the time for an interlocutory appeal of the injunction expired, the real parties in interest sought an order dissolving the temporary injunction.

*Respondent:* The Honorable Todd Wong, County Court at Law No. 1, Travis County, Texas.

*Ruling Assailed:* On December 8, 2017, the trial court granted the motion to dissolve the injunction despite the movants' failure to offer any evidence of a change in circumstances after the injunction was issued.

## STATEMENT OF JURISDICTION

Texas Government Code § 22.221(b)(1) provides jurisdiction.

## ISSUE PRESENTED

If a party seeking to dissolve a validly-obtained temporary injunction did not timely appeal the temporary injunction yet offers no evidence of a change of circumstances after the injunction was issued, is it a clear abuse of discretion for the trial court to dissolve the injunction?

## REASON FOR AMENDMENT

This Amended filing adds facts concerning the recordation of a written instrument by the real parties in interest along with a complete copy of said instrument, with signature pages, at Appendix Tab D.

## STATEMENT OF FACTS

The Jacksons sued to stop Ramsey and Cox from recording any amendments to subdivision restrictive covenants[1] unless Ramsey and Cox (1) sent prior notice of the proposed amendment to all owners and (2) obtained a recommendation from the subdivision's architectural committee. Following an evidentiary hearing, the trial court granted the Jacksons' motion for a temporary injunction on March 3, 2017.[2] *Ramsey and Cox did not appeal the order granting the temporary injunction.*

Ramsey and Cox have counterclaimed for wrongful injunction based on the trial court's grant of the relators' motion for same.[3]

On December 4, 2017, four days before the pretrial conference ahead of the December 11 trial, Ramsey and Cox filed a motion to dissolve the injunction.[4] The sole basis for their motion was that

---

[1] App. E (Plaintiffs' Exhibit 1 thereto).
[2] App. A.
[3] App. F.
[4] App. B.

the trial court reversed its interpretation of the restrictive covenants in an interlocutory summary judgment order. At the hearing on the motion to dissolve the injunction on December 8, Ramsey and Cox offered no evidence in support of their motion. The trial court granted the motion.[5] The trial setting was then passed by the parties owing to the unlikelihood of the case being reached.

On December 11, 2017, Ramsey and Cox recorded in the Official Records of Travis County an amendment to the restrictive covenants.[6] They had not notified all owners of the voting on the amendment in early 2017 and never obtained any recommendation from the subdivision's architectural committee.[7]

The deed restriction they relied upon in filing their amendment requires recordation of their amendment by March 7, 2017 (a ten-year anniversary date for recording amendments voted upon by a majority of owners).[8] Nevertheless, in addition to being filed on December 11, 2017, some of the signature pages show purported owner ratification as late as November and December,

[5] App. C.
[6] Tab D.
[7] Tab C (containing findings of fact); Tab E (transcript of injunction hearing).
[8] Tab E (Plaintiffs' Exhibit 1, § 1.4).

3

2017.[9]

On December 13, 2017, the Jacksons noticed an interlocutory accelerated appeal of the order dissolving the temporary injunction. No. 03-17-00846-CV.

## ARGUMENT

### I. Standard of Review

Mandamus relief is appropriate when a trial court clearly abuses its discretion and there is no adequate remedy at law. . A trial court clearly abuses its discretion when it reaches a decision that is arbitrary and unreasonable such that it amounts to a clear and prejudicial error of law or when it fails to correctly analyze or apply the law. *In re Olshan Found. Repair Co.*, 328 S.W.3d 883, 888 (Tex. 2010) (orig. proceeding). An erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion. *In re United Scaffolding, Inc.*, 301 S.W.3d 661, 663 (Tex. 2010) (orig. proceeding).

Whether there is an adequate appellate remedy is determined by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex.

---

[9] Tab D (signature pages).

4

2008) (orig. proceeding). In that balancing, the court considers whether mandamus will "preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding).

## II. The Trial Court Abused Its Discretion

As the authority relied upon by Ramsey and Cox in their motion to dissolve the temporary injunction holds, the movant must prove that a change in circumstances arose after the injunction was entered. *See Murphy v. McDaniel*, 20 S.W.3d 873, 877 (Tex. App. – Dallas 2000, no pet.). However, an interlocutory ruling on the merits of a case is not, in and of itself, a "change in circumstances" authorizing dissolution of an otherwise properly obtained temporary injunction. *Id.* at 878. This legal framework prevents a party who failed to appeal an order granting a

5

temporary injunction from doing so belatedly, and from getting an advance ruling from the court of appeals on the merits of a claim prior to final judgment. *Id*. at 877-879.

The sole basis for Ramsey and Cox's motion to dissolve the temporary injunction was their obtaining of an interlocutory summary judgment order favorable to them on the merits. They presented no evidence at all of any change in circumstances. Accordingly, the trial court clearly abused its discretion in granting the motion to dissolve the temporary injunction.

### III. The Jacksons Lack an Adequate Remedy by Appeal

Where a party has already established the validity of a temporary injunction, it is improper to force that party to re-establish the injunction's validity prior to final judgment in the case. *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984) (orig. proceeding).

Ramsey and Cox could have appealed the temporary injunction order but did not. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(4). Instead, they waited many months and, on the eve of trial, sought to force the Jacksons' to relitigate the early 2017

evidentiary injunction hearing. The Jacksons cannot seek an appeal of the validity of the original injunction, so mandamus is the appropriate remedy.

In addition, the Jacksons engage in leasing that Ramsey and Cox's recorded amendment would ban, and they have leases in force. The amendment is a direct threat to their property rights and contracts. It provides a basis for Ramsey and Cox to seek legal and equitable relief in the trial court that they should not have been entitled to seek at all had the injunction not been wrongfully procured. Expensive, wasteful new proceedings directly stemming from a clear abuse of discretion by the trial judge will be the result.

## IV. Remedies Appropriate by Mandamus

The order dissolving the injunction must be vacated and the injunction reinstated. *See State v. Walker*, 679 S.W.2d at 486. The Jacksons are simultaneously seeking emergency relief to stay the trial court's order in both their interlocutory accelerated appeal and in this original proceeding.

## PRAYER FOR RELIEF

This Court should grant Relators the Jacksons' petition for a writ of mandamus and direct the trial court to vacate its December 8, 2017 order dissolving the temporary injunction and to reinstate the injunction. The Court should remand the case consistent with the above and grant any other relief to which the relator may be justly and in fairness entitled.

Respectfully submitted,

**_/s/ J. Patrick Sutton_**
J. Patrick Sutton
Texas Bar No. 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903
Fax. (512) 355-4155
_jpatricksutton@_
_jpatricksuttonlaw.com_
Attorney for Relator

## RULE 52.7(a)(2) STATEMENT AS TO EVIDENCE

In the trial court, the real party in interest put it no evidence in support of its motion to dissolve the temporary injunction. A record was made of the arguments of counsel at the hearing.

## RULE 52.3(j) CERTIFICATION

I have reviewed the petition and concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

/s/ J. Patrick Sutton
J. Patrick Sutton

## CERTIFICATE OF SERVICE

I certify that on December 15, a true and correct copy of this AMENDED petition was served by efiling on:

Michael L. Navarre
Beatty Bangle Strama P.C.
400 West 15th Street, Suite 1450
Austin, Texas 78701
Phone: 512.879.5050 / Fax: 512.879.5040
*mnavarre@bbsfirm.com*

/s/ *J. Patrick Sutton*
Attorney for Relator

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in Century Schoolbook 14-point for text and 12-point for footnotes. Spacing is expanded by .6 point for clarity. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains **1089** words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/ *J. Patrick Sutton*
Attorney for Relator

No. 03-17-_____-CV

## In The Court of Appeals for the Third District of Texas at Austin

*In re Richard W. Jackson and Lisa C. Jackson,*

*Relators.*

From the County Court at Law No. 1, Travis County, Texas
Trial Court Cause No. C-1-CV-17-001833

## APPENDIX TO PETITION FOR WRIT OF MANDAMUS

| | |
|---|---|
| Order granting Defendants' motion to dissolve TI | Tab A |
| Defendants' Motion to Dissolve TI | Tab B |
| Order granting temporary injunction | Tab C |
| Recorded Amendment (without signature pages) | Tab D |
| Transcript of March 9, 2017 injunction hearing | Tab E |

Tab A

CAUSE NO. C-1-CV-17-001833

| RICHARD W. JACKSON, | § | IN THE COUNTY COURT |
| LISA C. JACKSON, and | § | |
| KATHLEEN WOODALL, | § | |
| Plaintiffs, | § | AT LAW NUMBER TWO OF |
| vs. | § | |
| | § | |
| JANICE COX and HELEN RAMSEY, | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## ORDER GRANTING MOTION TO DISSOLVE THE TEMPORARY INJUNCTION

Before the Court is Defendants/Counter-Plaintiffs' Motion to Dissolve the Temporary Injunction. The Court, having considered the Motion, the Response, the evidence, the pleadings and papers on file herein, and arguments of counsel, is of the opinion that it is meritorious and _in part_. should be granted. Accordingly,

IT IS ORDERED, ADJUDGED, AND DECREED that Defendants/Counter-Plaintiffs' Motion to Dissolve the Temporary Injunction is hereby GRANTED in its entirety. _herein, real issue is not determined at this time,_ TW

SIGNED this ___ day of December, 2017.

_____
JUDGE PRESIDING
TODD T. WONG

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on DEC 1 3 2017

Dana DeBeauvoir, County Clerk
By Deputy:

# Tab B

Filed: 12/4/2017 10:48 PM
Dana DeBeauvoir
Travis County Clerk
C-1-CV-17-001833
Kylie Uhlaender

CAUSE NO. C-1-CV-17-001833

| | | |
|---|---|---|
| RICHARD W. JACKSON, | § | IN THE COUNTY COURT |
| LISA C. JACKSON, and | § | |
| KATHLEEN WOODALL, | § | |
|       Plaintiffs, | § | AT LAW NUMBER TWO OF |
| vs. | § | |
| | § | |
| JANICE COX and HELEN RAMSEY, | § | |
|       Defendants. | § | TRAVIS COUNTY, TEXAS |

## DEFENDANTS' MOTION TO DISSOLVE THE TEMPORARY INJUNCTION

Defendants and Counter-Plaintiffs file their Motion To Dissolve The Temporary Injunction, and would respectfully show the court the following:

## I. EXECUTIVE SUMMARY

**Background:** On February 24, 2017, Plaintiffs sued Ms. Cox and Ms. Ramsey to prevent them from following Section 4 of Article I of the 1972 Deed Restrictions to prohibit rentals for less than ninety (90) days. Plaintiffs' claims were for (1) a declaratory judgment that a notice and ACC approval requirement in Article IX of the 1972 Deed Restrictions could be copied/pasted into Section 4 of Article I of the 1972 Deed Restrictions and (2) breach of contract based on this same rewriting of the 1972 Deed Restrictions. Plaintiffs moved for a temporary restraining order and a subsequent temporary injunction, which the Court granted.

**Problem:** On November 17, the Court ruled against Plaintiffs on their sole basis for the temporary injunction. The Court rejected Plaintiffs' interpretation of the 1972 Deed Restrictions and granted Defendants' Motion for Partial Summary Judgment As To Claims And Counterclaims Concerning Section 4 Of Article I Of The Restrictive Covenants. Furthermore, Plaintiffs previously dropped their breach of contract claim that was based on their same faulty contract interpretation.

**Relief:** Defendants respectfully request that the Court grant this Motion, dissolve the temporary injunction, award Defendants the bond, and grant further relief.

## II. ARGUMENT AND AUTHORITIES

**A.    The Sole Basis For Plaintiffs' Temporary Injunction Was Their Faulty Contract Interpretation.**

On February 24, 2017, Plaintiffs sued Ms. Cox and Ms. Ramsey.  Their sole claim for declaratory judgment was the following:[1]

> "Plaintiffs seek a declaration that 30 days' notice to all owners of proposed amendments and the prior recommendation of the ACC are required before any amendment may be adopted and recorded."

As set forth in Plaintiffs' lawsuit, these requirements are in Article IX of the 1972 Deed Restrictions.[2] These requirements are not in Section 4 of Article I of the 1972 Deed Restrictions. Plaintiffs' breach of contract claim was based on Plaintiffs' same faulty interpretation of the 1972 Deed Restrictions.[3]  Although Plaintiffs amended their claim twice before the temporary injunction hearing, these claims remained the same and Plaintiffs did not add any new claims.[4]

In his opening argument, Plaintiffs' counsel made it clear that the sole basis for Plaintiffs' request for a temporary injunction was their faulty interpretation of the 1972 Deed Restrictions: [5]

> "We will show and will also argue that there are certain deeds restrictions in a subdivision from 1972 and that those deed restrictions do not allow any amendment to those restrictions without two specific things occurring.
>
> One, written notice to all owners 30 days in advance of the adoption of the amendment.  Two, a quote "recommendation" by an entity called the architectural control authority."

Subsequently, the parties filed competing motions for partial summary judgment concerning the proper interpretation of the 1972 Restrictions.  The Court recently ruled in favor of Defendants and granted partial summary judgment against Plaintiffs' claims.

---

[1]  Plaintiffs' Original Petition at ¶ 25.

[2]  *Id.* at ¶ 13.

[3]  *Id.* at ¶ 26-29.

[4]  Plaintiffs' First Amended Petition at ¶ 25; 26-29; Plaintiffs' Second Amended Petition at ¶ 25; 26-29.

[5]  Transcript of March 9, 2017 Temporary Injunction Hearing at 6-7.

**B.** **The Court Rejected The Sole Basis For Plaintiffs' Temporary Injunction And Granted Defendants' Motion For Partial Summary Judgment Against Plaintiffs' Claims.**

On October 12, 2017, Defendants filed their Motion For Partial Summary Judgment As To Claims And Counterclaims Concerning Section 4 Of Article I Of The Restrictive Covenants ("Defendants' MPSJ"). As set forth in the Motion, Defendants sought a partial summary judgment as to the claims that were the basis for Plaintiffs' temporary injunction:[6]

> **This Motion for Partial Summary Judgment covers Plaintiffs' claims for (1) declaratory judgment that "30 days' notice to all owners of proposed amendments and the prior recommendation of the ACC are required before any amendment may be adopted and recorded" and (2) breach or attempted breach of the Restrictive Covenants.** Defendants also move for summary judgment on their declaratory judgment claim that the requirements of notice and prior recommendation of the Architectural Control Authority in Article IX are not copied/pasted into Section 4 of Article I of the Restrictive Covenants.

On the other hand, Plaintiffs filed their Renewed Cross-Motion for Partial Summary Judgment Concerning Procedure for Amending Restrictive Covenants ("Plaintiffs' Cross-MPSJ"). Plaintiffs' Cross-MPSJ was a mirror-image of Defendants' MPSJ and sought the opposite interpretation of the 1972 Deed Restrictions.

On November 17, 2017, the Court issued its rulings. Importantly, the Court granted Defendants' MPSJ as to this contract interpretation issue:[7]

> "ORDERED, ADJUDGED, AND DECREED that Defendants' Motion for Partial Summary Judgment as to Claims and Counterclaims Concerning Section 4 of Article I of the Restrictive Covenants is GRANTED."

The Court similarly denied Plaintiffs' Cross-MPSJ. By its orders, the Court disposed of Plaintiffs' claims in favor of Defendants.

---

[6] Defendants' MPSJ at 3 (emphasis added).

[7] Order on Defendants' Motions for Summary Judgment at 2 (emphasis in original).

**C.     The Court Should Dissolve The Injunction And Grant Relief To Defendants.**

By its Orders, the Court also eliminated the sole basis of Plaintiffs' temporary injunction. There is no basis for Plaintiffs' temporary injunction. Therefore, pursuant to Texas law, the Court should dissolve the temporary injunction. *Murphy v. McDaniel*, 20 S.W.3d 873, 878 (Tex. App.—Dallas 2000, no pet.) (explaining the circumstance that result in the dissolution of a temporary injunction). Furthermore, the Court should award the $10,000 bond to Defendants. *Energy Transfer Fuel, L.P. v. Bryan*, 322 S.W.3d 409, 413-14 (Tex. App.—Tyler 2010, no pet.) (citing *DeSantis v. Wackenhut Corp.* 793 S.W.2d 670, 685 (Tex. 1990)). Finally, if the Court deems it necessary, Defendants request equitable or other relief in the form of time to file the change to the 1972 Restrictions or some other form to cure any harm caused to Defendants.

### III.  CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that the Court grant this Motion, dissolve the temporary injunction, award Defendants the bond, and if the Court deems it necessary, Defendants request equitable or other relief in the form of time to file the change to the 1972 Restrictions or some other form to cure any harm caused to Defendants grant further relief. Defendants also request such other relief as the Court deems proper.

Respectfully submitted,

*/s/ Michael L. Navarre*
Michael L. Navarre
State Bar No. 00792711
BEATTY BANGLE STRAMA, PC
400 West 15th Street, Suite 1450
Austin, Texas  78701
(512) 879-5050  Telephone
(512) 879-5040  Facsimile
mnavarre@bbsfirm.com

*ATTORNEYS FOR DEFENDANTS*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was electronically served on counsel of record by electronic transmission on this 4th day of December, 2017:

James Patrick Sutton – via jpatricksutton@jpatricksuttonlaw.com
The Law Office of J. Patrick Sutton
1706 W. 10th St.
Austin, Texas  78701


Mr. David M. Gottfried – via david.gottfried@thegottfriedfirm.com
The Gottfried Firm
West Sixth Place
1505 West Sixth Street
Austin, Texas 78703


/s/ *Michael L. Navarre*
Michael L. Navarre

Tab C

# *TEMPORARY INJUNCTION*

THE STATE OF TEXAS

To:

**POINT VENTURE NEIGHBORS FOR STR REFORM**
**c/o SAVE OUR SECTION 3-1**
**P.O. BOX 4114**
**LAGO VISTA, TX 78645**

WHEREAS, in Cause No. **C-1-CV-17-001833** pending on the docket of the COUNTY COURT AT LAW #2 of Travis County, Texas, wherein RICHARD W JACKSON is Plaintiff and JANICE COX is Defendant, the Plaintiff filed an Application for a Temporary Restraining Order, asking among other things for granting and issuance of a Writ of Temporary Restraining Order, to restrain the Defendant, JANICE COX, fully set out and prayed for in the Application, a certified copy of which is attached hereto and to which reference is here made for the injunctive relief sought by the Plaintiff; upon presentation and consideration of said application, the Honorable TODD T WONG has entered in said cause the following, to wit: (See attached copy of order)

AND WHEREAS, BOND has been filed and approved;

THESE ARE, THEREFORE, to restrain, and you, JANICE COX are hereby restrained as fully set out and prayed for in the Application for Restraining Order, certified copy of which is attached hereto, made a part hereof and to which reference is hereby made for full and complete statement.

AND YOU ARE FURTHER NOTIFIED that the hearing on Plaintiff's Application for a Temporary Injunction is set for **JUNE 26, 2017 at time upon agreement of counsel** at the **County Courthouse in the City of Austin,** at which time you are required to appear and show cause, if any, why said injunction should not be granted as prayed for;
**HEREIN FAIL NOT** to obey this writ, under the pains and penalties prescribed by Law!
Issued and given under my hand and seal of office on March 09, 2017.



DANA DeBeauvoir, Travis County Clerk
P.O. Box 1748, Austin, Texas 78767

By Deputy: _____
A M PEREZ

----------------------------------OFFICER'S RETURN--------------------------------
Came to hand on the _____day of _____, 20___ at _____ o'clock
__M, and executed the _____ day of _____, 20___ at _____o'clock
___M, by delivery to the within named DEFENDANT'S NAME at

_____In Travis County, Texas, in person, a true copy of this Notice the accompanying copy attached thereto.
To Certify which witness my hand officially.
BRUCE ELEFANT, CONSTABLE PRECINT 5
TRAVIS COUNTY, TEXAS

By Deputy:_____

59C - 000000056

# *TEMPORARY INJUNCTION*

THE STATE OF TEXAS

To:

**POINT VENTURE NEIGHBORS FOR STR REFORM**
**c/o SAVE OUR SECTION 3-1**
**P.O. BOX 4114**
**LAGO VISTA, TX 78645**

WHEREAS, in Cause No. C-1-CV-17-001833 pending on the docket of the COUNTY COURT AT LAW #2 of Travis County, Texas, wherein RICHARD W JACKSON is Plaintiff and JANICE COX is Defendant, the Plaintiff filed an Application for a Temporary Restraining Order, asking among other things for granting and issuance of a Writ of Temporary Restraining Order, to restrain the Defendant, JANICE COX, fully set out and prayed for in the Application, a certified copy of which is attached hereto and to which reference is here made for the injunctive relief sought by the Plaintiff; upon presentation and consideration of said application, the Honorable TODD T WONG has entered in said cause the following, to wit: (See attached copy of order)

AND WHEREAS, BOND has been filed and approved;

THESE ARE, THEREFORE, to restrain, and you, JANICE COX are hereby restrained as fully set out and prayed for in the Application for Restraining Order, certified copy of which is attached hereto, made a part hereof and to which reference is hereby made for full and complete statement.

AND YOU ARE FURTHER NOTIFIED that the hearing on Plaintiff's Application for a Temporary Injunction is set for **JUNE 26, 2017 at time upon agreement of counsel** at the **County Courthouse in the City of Austin**, at which time you are required to appear and show cause, if any, why said injunction should not be granted as prayed for;
**HEREIN FAIL NOT** to obey this writ, under the pains and penalties prescribed by Law!
Issued and given under my hand and seal of office on March 09, 2017.



DANA DeBeauvoir, Travis County Clerk
P.O. Box 1748, Austin, Texas 78767

By Deputy: _____
                    A M PEREZ

------------------------------OFFICER'S RETURN------------------------------
Came to hand on the _____ day of _____, 20___ at _____ o'clock
__M, and executed the _____ day of _____, 20___ at _____o'clock
___M, by delivery to the within named DEFENDANT'S NAME at _____

_____In Travis County, Texas, in person, a true copy of this Notice the accompanying copy attached thereto.
To Certify which witness my hand officially.
BRUCE ELEFANT, CONSTABLE PRECINT 5
TRAVIS COUNTY, TEXAS

By Deputy: _____

59C - 000000056

| | | |
|---|---|---|
| RICHARD W. JACKSON, LISA C. JACKSON, and KATHLEEN WOODALL, Plaintiffs, | § § § § § | IN THE COUNTY COURT AT LAW |
| V. | § § | |
| JANICE COX and HELEN RAMSEY, individually and d/b/a Point Venture Neighbors For STR Reform, an unincorporated association; and POINT VENTURE NEIGHBORS FOR STR REFORM, an unincorporated association, Defendants. | § § § § § § § § § § § § | NUMBER 2 |
| | | OF TRAVIS COUNTY, TEXAS |

## ORDER FOR ISSUANCE OF TEMPORARY INJUNCTION

Plaintiffs sued Defendants for breach and attempted breach of restrictive covenant. Plaintiffs sought issuance of a temporary restraining order and temporary injunction. The Court granted the temporary restraining order and set the temporary injunction request for hearing on March 9, 2017.

After due notice and a hearing on the request for a temporary injunction at which counsel for both parties were present, and due consideration of the evidence and the arguments of counsel, the Court is of the opinion that the request for a temporary injunction should be granted.

The Court makes the following findings:

1. Defendants Cox and Ramsey are owners in the Point Venture Section Three-1 subdivision ("subdivision") in Travis County, Texas. As such, they are subject to deed restrictions recorded in 1972 in the Official Records of Travis County, Texas at Vol. 4291, Page 1452 ("1972 Restrictions") which apply to the subdivision and the

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR - 9 2017

Dana DeBeauvoir, County Clerk

By Deputy: A. M. PEREZ

individual properties therein.

2. All Plaintiffs are likewise owners in the subdivision and are likewise subject to the 1972 Restrictions.

3. The 1972 Restrictions provide that "any violation or attempted violation" may be enforced "by any proceedings at law or in equity against any person or persons violating or attempting to violate any" of the 1972 Restrictions. Further, that "it shall not be a prerequisite to the granting of [an] injunction to show inadequacy of legal remedy or irreparable harm."

4. Among the 1972 Restrictions are a requirements that "all . . . lot owners shall be given thirty (30) days notice in writing of any proposed amendment before same is adopted" and that any amendment cannot occur "without the prior recommendation of the Architectural Control Authority." These requirements apply to all amendments and can be harmonized with all other provisions of the deed restrictions, irrespective of what percentage of owners must approve amendments, which the deed restrictions provide varies depending on the circumstances.

5. Defendants are violating or attempting to violate the 30-day-notice and Architectural Control Authority requirements. Defendants seek to record an amendment to the 1972 Restrictions. Defendants did not provide the requisite 30 days' prior notice of amendment to Plaintiffs. The Architectural Control Authority did not make any recommendation concerning the proposed amendment.

6. Based on the 1972 Restrictions, Plaintiffs need not show irreparable injury or the inadequacy of a legal remedy in order to obtain an injunction.

7. Plaintiffs' injury will outweigh any injury to Defendants because the amendment proposed by Plaintiffs is likely to be void and unenforceable if recorded without meeting the requirements of the deed restrictions, while Defendants remain free to pursue amendment in the manner afforded by the 1972 Restrictions.

6. The restraining order will not disserve the public interest because

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR – 9 2017

Dana DeBeauvoir, County Clerk

By Deputy: A. M. PEREZ

contractual due process under the 1972 deed restrictions is a right of all subdivision property owners for this and other subdivisions.

7. The status quo should be maintained, in the public interest; and

8. *prior cash bond previously submitted by Plaintiffs is sufficient and the* Plaintiffs' bond in the amount of $10,000.00 will fully protect Defendants' rights during the pendency of this action.

It is therefore ORDERED, ADJUDGED, AND DECREED that a temporary injunction issue, operative until judgment is entered in this case, enjoining Defendants Janice Cox, Helen Ramsey, and Point Venture Neighbors For STR Reform, and all persons acting in concert with them or on their behalf, from recording in the Official Records of Travis County, Texas, any amendments to the 1972 Restrictions which are not in compliance with the 30-day notice requirement and the requirement of prior recommendation of the Architectural Control Authority. Before the issuance of the restraining order, Plaintiffs shall have posted bond in the amount of $10,000.00, payable to Defendants, conditioned and approved as required by law.

SIGNED on ____9th of March, 2017____ at _10:55_ A-M.

_____
JUDGE PRESIDING

Todd T. Wong

APPROVED AS TO FORM:

_____
J. Patrick Sutton
Attorney for Plaintiffs

_____
William E. Sterling, Jr.
Attorney for Defendants

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR - 9 2017

Dana DeBeauvoir, County Clerk
By Deputy:

A. M. PEREZ

# ORDER SETTING CAUSE FOR TRIAL

It is ORDERED that the foregoing cause of action is set for trial on

during week of June 21 -30, 2017, at _____ A.M./P.M. — upon agreement of counsel.

SIGNED ON Mar 9, 2017

_____
JUDGE PRESIDING

**Todd T. Wong**

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR - 9 2017

Dana DeBeauvoir, County Clerk

By Deputy: A. M. PEREZ

Tab D



## AMENDMENT TO RESTRICTIONS

STATE OF TEXAS       §

                               §

COUNTY OF TRAVIS    §

### ARTICLE I. RECITALS

The undersigned owners hereby amend those certain restrictions recorded in Volume 4291, Page 1452, Deed Records of Travis County, Texas, concerning Point Venture, Section Three-1, according to the plat of said subdivision recorded in Volume 58, Page 48, Plat Records, Travis County, Texas ("Subject Property").

### ARTICLE II. AMENDMENT

No property shall be rented except under a written lease for a term of not less than ninety (90) days. The purpose of this amendment is to prohibit short term rentals. Any lease that attempts to circumvent this prohibition by offering early cancellation, early termination without penalty, or any other scheme to violate the intent of this prohibition will be deemed to be a violation of this restriction.

### ARTICLE III. GENERAL

3.1      **Enforcement; Obligations Run with the Land.** The restriction adopted and established for the Subject Property by this Restriction is imposed upon and made applicable to the Subject Property and shall run with the Subject Property and shall (i) be binding upon and inure to the benefit of and be enforceable by any owner, and each purchaser and grantee of the Subject Property or any portion thereof, and the respective heirs, legal representatives, successors and assigns of any owner and (ii) inure to the benefit of and be enforceable by any owner of property in this subdivision, and the respective heirs, legal representatives, successors and assigns of any such owner.

3.2.      **Strict Compliance.** Each owner of the Subject Property, or any portion thereof, shall strictly comply with the purpose of this Restriction. Failure to strictly comply with this Restriction shall be grounds for an action to recover sums due for damages, injunctive relief, or both, including reasonable attorney fees, maintainable by any owner and the respective heirs, legal representatives, successors and assigns of each owner.

3.3.      **Amendment.** This restriction may not be amended, altered, repealed, terminated or modified in any way unless and until (i) the approval of owners of sixty-seven (67%) of the Subject Property is obtained, each as evidenced by a written instrument executed by such owners and filed in the Real Property Records of Travis County, Texas.

3.4      **Gender and Number.** The singular wherever used herein shall be construed to mean the plural where applicable, the pronouns of any gender shall include the other genders, and the necessary grammatical changes required to make the provisions hereof applicable to individuals, corporations, trusts, partnerships, or other entities shall in all cases be assumed as though in each case fully expressed.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 12/11/17

Dana DeBeauvoir, County Clerk
By Deputy JSWilliams

- 1 -

3.5 **Interpretation**. If this Restriction or any word, clause, sentence, paragraph or other part thereof shall be susceptible to more than one or conflicting interpretations, then the interpretation which is most nearly in accord with the general purposes and objectives of this Restriction shall govern.

3.6 **Omissions**. If any punctuation, word, clause, sentence or provision necessary to give meaning, validity or effect to any other word, clause, sentence or provision appearing in this Restriction shall be omitted herefrom, then it is hereby declared that such omission was unintentional and that the omitted punctuation, word, clause, sentence or provision shall be supplied by inference.

3.7 **Incorporation of Recital and Introductory Paragraph**. The Recitals and introductory paragraph of these Restrictions are hereby fully incorporated into, and a part of, these Restrictions for all purposes.

*[Remainder of this page intentionally blank. Execution on following page.]*



I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 12/11/17

Dana DeBeauvoir, County Clerk
By Deputy: SS Williams

- 2 -



Tab E

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUMES

TRIAL COURT CAUSE NO. C-1-CV-17-001833

| | | |
|---|---|---|
| RICHARD W. JACKSON, | ) | IN THE COUNTY COURT |
| LISA C. JACKSON, AND | ) | |
| KATHLEEN A. KOLB | ) | |
| WOODALL | ) | |
| | ) | |
| | ) | |
| VS. | ) | AT LAW NO. 1 |
| | ) | |
| | ) | |
| JANICE COX, HELEN | ) | |
| RAMSEY, POINT VENTURE | ) | |
| NEIGHBORS FOR STR | ) | |
| REFORM | ) | TRAVIS COUNTY, TEXAS |

*********************************************************

TEMPORARY INJUNCTION

*********************************************************

On the 9th day of March, 2017, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Todd T. Wong, Judge presiding, held in Austin, Travis County, Texas:

Proceedings reported by machine shorthand.

A P P E A R A N C E S


ATTORNEYS FOR THE PLAINTIFFS:

    Mr. James Patrick Sutton
    SBOT NO. 24058143
    THE LAW OFFICE OF J. PATRICK SUTTON
    1706 West 10th Street
    Austin, Texas  78703
    Phone:  512-417-5903
        - AND -
    Mr. David M. Gottfried
    THE GOTTFRIED FIRM
    SBOT NO. 08231200
    West Sixth Place
    1505 West Sixth Street
    Austin, Texas  78703
    Phone:  512-494-1481


ATTORNEY FOR THE DEFENDANTS:

    Mr. William E. 'Bill' Sterling
    SBOT NO. 19175200
    WILSON, STERLING & RUSSELL
    9951 Anderson Mill Road, Suite 200
    Austin, Texas  78750
    Phone: 512-258-2244

**INDEX**

**VOLUME 1**

**Temporary Injunction**

March 9, 2017

|  | PAGE | VOL. |
|---|---|---|
| Announcements . . . . . . . . . . . . . . . . . .5 | | 1 |
| Opening Statement by Mr. Sutton . . . . . . . .6 | | 1 |
| Opening Statement by Mr. Sterling . . . . . . .7 | | 1 |

| **Plaintiff's Witnesses** | **Direct** | **Cross** | **Voir Dire** | **Vol.** |
|---|---|---|---|---|
| Janice Cox | | | | |
| By Mr. Gottfried | 16 | | | 1 |
| By Mr. Sterling | | 23 | | 1 |
| By Mr. Gottfried | 29 | | | 1 |
| By Mr. Sterling | | 29 | | 1 |
| Helen Ramsey | | | | |
| By Mr. Gottfried | 30 | | | 1 |
| By Mr. Sterling | | 33 | | 1 |
| Kathleen Woodall | | | | |
| By Mr. Gottfried | 34 | | | 1 |
| By Mr. Sterling | | 38 | | 1 |
| By Mr. Gottfried | 41 | | | 1 |

|  | PAGE | VOL. |
|---|---|---|
| Closing Argument by Mr. Sutton . . . . . . . . 44 | | 1 |
| Closing Argument by Mr. Sterling . . . . . . . 52 | | 1 |
| Closing Argument by Mr. Sutton . . . . . . . . 59 | | 1 |
| Closing Argument by Mr. Sterling . . . . . . . 61 | | 1 |
| Court's Ruling . . . . . . . . . . . . . . . . . 67 | | 1 |
| Adjournment . . . . . . . . . . . . . . . . . .69 | | 1 |
| Court Reporter's Certificate . . . . . . . . . 70 | | 1 |

**ALPHABETICAL INDEX OF WITNESSES**

|  | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| COX, JANICE | | | | |
| By Mr. Gottfried | 16 | | | 1 |
| By Mr. Sterling | | 23 | | 1 |
| By Mr. Gottfried | 29 | | | 1 |
| By Mr. Sterling | | 29 | | 1 |

**INDEX – VOLUME 1 CONT.**

**ALPHABETICAL INDEX OF WITNESSES**

|  | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| RAMSEY, HELEN | | | | |
| By Mr. Gottfried | 30 | | | 1 |
| By Mr. Sterling | | 33 | | 1 |
| WOODALL, KATHLEEN | | | | |
| By Mr. Gottfried | 34 | | | 1 |
| By Mr. Sterling | | 38 | | 1 |
| By Mr. Gottfried | 41 | | | 1 |

**EXHIBITS OFFERED BY THE PLAINTIFF**

| EXHIBIT | DESCRIPTION | OFFER | ADMIT | VOL. |
|---|---|---|---|---|
| 1 | Point Venture Section Three-1 Plat Record | 13 | 14 | 1 |
| 2 | General Provisions | 14 | 14 | 1 |
| 3 | Amendment to Restrictions | 15 | 15 | 1 |
| 4 | Notes | 21 | 21 | 1 |

**EXHIBITS OFFERED BY THE PLAINTIFF**

| EXHIBIT | DESCRIPTION | OFFER | ADMIT | VOL. |
|---|---|---|---|---|
| 1 | VRBO web listing | 27 | 28 | 1 |

**P R O C E E D I N G S**

**March 9, 2017**

THE COURT: C-1-CV-17-001833, Richard Jackson and Lisa Jackson versus Janice Cox, Helen Ramsey, Point Venture Neighbors.

Counsel, if you would go ahead and make your appearances for record.

MR. SUTTON: Judge, Patrick Sutton and David M. Gottfried for all plaintiffs.

THE COURT: All right. Thank you.

MR. STERLING: William Sterling, Jr. for defendants, Janice Cox and Helen Ramsey. In reality, there is no incorporated or association.

THE COURT: Okay. Very good. All right. Thank you very much.

All right. I read the original -- well, I guess the third amended petition that was filed. I read the TRO. Pulled some cases.

You-all have anything you want me to look at?

MR. STERLING: Your Honor, I did file an answer, and I sent a copy to Court 2's staff attorney and I don't know whether that's...

MR. GOTTFRIED: If I may approach, Your Honor?

THE COURT: Sure. All right.

So we're here just on the temporary injunction. This is not a permanent injunction. It's no final hearing on anything. So just to remind counsel, you keep that in mind as you proceed today.

All right. Well, plaintiffs, may proceed.

MR. SUTTON: Judge, what I'd like to do is just preview for you what the evidence will show.

THE COURT: That would be great. If you could do that, then I'll let the defendant do the same.

**OPENING BY PLAINTIFF**

MR. SUTTON: Thank you, Judge.

First, we will show and will also argue that there are certain deeds restrictions in a subdivision from 1972 and that those deed restrictions do not allow any amendment to those restrictions without two specific things occurring.

One, written notice to all owners 30 days in advance of the adoption of the amendment. Two, a, quote, "recommendation" by an entity called the architectural control authority.

We will then show, one, that the defendants failed to meet those two requirements, that there is an architectural control authority, and that the defendants have circulated an amendment which would

restrict the rights of property owners, actually bar property owner's right to rent for short terms.

We will have seven witnesses who will talk about the lack of notice, the existence of an architectural control authority, and then, finally, Judge, we'll show that all that deed restrictions provide that all that is required for a temporary injunction in this case is a showing of a breach or attempted breach, and that the deed restrictions specifically remove the requirement of irreparable injury or that money damages are not an adequate remedy.

Thank you, Judge.

THE COURT: Thank you.

Counsel.

**OPENING BY DEFENDANT**

MR. STERLING: Your Honor, we -- they're going to be introducing a certified copy of 1972 restrictions, and we don't have any quarrel with that particular document as it's going to be presented.

We do disagree with counsel as to whether or not there is a requirement for 30 days notice or a requirement for having ACA approval when it comes to an attempted change of the restrictive covenants under a particular portion of the restrictive covenants themselves.

And we'll call Your Honor's attention to Section -- I believe it's Section 1.

THE COURT: It's 1.4, isn't it?

MR. STERLING: 1.4, yes.

And that particular section allows for a majority of the lot owners to change the 1972 restrictions by getting a document signed by them, proper manner of recording it in the deed records, and then so recording. And that's the only real requirements that are there.

We're going to be arguing that, in essence, the provision that the other side has been referred to is not applicable to that particular provision. It may be under a section having to do with label amendments. But right on that same page is going to be a section -- I think it's Section 11 of the document that basically says that -- it's on Section 11 -- talk about captions. And captions basically say forget the captions. They don't mean anything. You can look at it as if they were never there in terms of doing that.

THE COURT: But you just told me -- you referred to me 9 which says Amendments, but in the body of that provision, it talks about any covenants that may be annulled, amended, or modified. So it's not just

amendments either, right?

MR. STERLING: Well, it's -- I think it's referring only to the particular form by which they go about doing it using this particular provision. If you want to change any time during the year, at any time you have to go through the ACA and give your 30 days notice. But if you're going through this other provision, the provision that allows you to change it but it doesn't become effective until the next period of duration, if you do it that way, it's a totally different system.

In other words, the changes where you're using the ACA, you're going to be having -- having to have notice who's going to go voting and all that kind of stuff. There's no voting when it comes to the actual use of this majority getting a changing instrument and signing it and recording it. You're voting by signing on the instrument or not signing the instrument.

THE COURT: I see your argument.

MR. STERLING: So basically that's what I'm saying, it's a whole different thing.

And so what I wanted to state is that that's the crux of what the problem is between my client -- my clients and theirs is the interpretation of those two particular provisions. They want to basically say that their provision overrides and makes mine

meaningless, essentially.

THE COURT: They're not saying they can coalesce together.

MR. STERLING: Well, they may be trying to say that, but I don't see how they can really coalesce together. How do you do a 30 days in advance of when you're picking up individual signatures, you know, as you go, and it may take you the whole 10-year period to get them all signed up?

It's just not the same thing. You're not doing a vote-type situation.

But in any case, what I was getting at is that that's the crux of it. And what they're trying to do is add a temporary injunction to kill our current effort to try to change the restrictive covenants to disallow, you, know, these short-term rentals. And they're trying to, basically, use that -- use this temporary injunction in order to try to prevent us from getting there. Essentially getting there during this period.

THE COURT: Let me stop you there. From my reading, they're enjoining you from going through the process from not engaging in the process that's set up under the restriction, under this document. And I understand what you're saying is that they're preventing

you from doing the -- using provision or paragraph 4. You're trying to go through paragraph 4.

MR. STERLING: Right.

THE COURT: And they're saying, no, you've got to go through 9.

MR. STERLING: Right.

THE COURT: Is that about it?

MR. STERLING: That's about it.

THE COURT: Okay. All right.

MR. STERLING: But the one thing I wanted to get across is that if we don't make -- essentially the way this -- our method works is that the successive periods essentially provides for duration of these original restrictive covenants starting out with a 35-year period then it goes succeeding 10-year period, et cetera. We're at the end of a 10-year period.

THE COURT: You're at the end of the second 10-year period.

MR. STERLING: Right. And if we are not successful in getting signed up a majority and recorded all those done by March 15th, we will be prevented from this taking effect until the next period beyond that. Not, you know --

THE COURT: It's not March 27th? It's March 15th?

MR. STERLING:  Well, March 27th.  That's a good question because March 15th is when it was signed, the original.

THE COURT:  Oh, I see.

MR. STERLING:  But it wasn't recorded until 19 or till March 27th.  Whichever date, the point is if we don't get it done certainly within one of those two days, we could end up in a situation where it would not take effect during the next 10-year period but the one after that is what would happen.  So, in effect, we'll be stopping this thing from being effective for a full 10 years using this method.

THE COURT:  All right.

MR. STERLING:  And that will cause it to happen by just doing a temporary injunction.

THE COURT:  I see.  You could read it that way.  You might read it another way too.

MR. STERLING:  Well, I think if you can figure out a way for us to get it effective otherwise, I would be happy to do that.

THE COURT:  I'm not going to engage in that with you, but I think there may be a creative way to do something there but, all right.  Very good.

MR. STERLING:  All right.  I think that basically --

THE COURT:  Is that it?

MR. STERLING:  -- gives us an idea what our situation and our position is.

THE COURT:  Fair enough.  All right.  Thank you both.

Counsel for plaintiff, you-all may proceed.

MR. GOTTFRIED:  Good morning, Your Honor.

Being mindful of the fact this is a temporary injunction hearing not a permanent injunction hearing, I think we may be able to cut through some of the formalities by stipulating as to a couple of documents.

THE COURT:  Fantastic.

MR. GOTTFRIED:  I visited with Mr. Sterling and he's graciously agreed that we can mark this plat as Plaintiff's Exhibit 1.

MR. STERLING:  I have no objection.

THE COURT:  So he has no objection you admitting it into evidence.

MR. Gottfried:  May I approach?

THE COURT:  Yes, of course.  Thank you.

MR. GOTTFRIED:  Your Honor, we would move for the admission of Plaintiff's Exhibit Number 1.

(Plaintiff's Exhibit No. 1 offered.)

THE COURT: All right. Thank you.

Plaintiff's Exhibit 1 admitted.

(Plaintiff's Exhibit No. 1 admitted.)

MR. GOTTFRIED: Your Honor, that's just to give you some perspective of where this subdivision is. It's on Lake Travis. And the folks that are in the courtroom today are the waterfront section of Lake Travis.

THE COURT: Okay.

MR. GOTTFRIED: May I approach, Your Honor?

THE COURT: Yes. Thank you.

MR. GOTTFRIED: Mr. Sterling and I have also stipulated to the deed restrictions, which I've just provided the Court as Plaintiff's Exhibit Number 2 and move for the admission of Plaintiff's 2.

(Plaintiff's Exhibit No. 2 offered.)

THE COURT: All right. Thank you.

MR. STERLING: I have no objection, Your Honor.

THE COURT: All right. Thank you.

Plaintiff's Exhibit 2 is admitted.

You-all don't need to ask permission to come up and show me stuff. It's fine.

(Plaintiff's Exhibit No. 2 admitted.)

MR. GOTTFRIED:  Your Honor, I have handed the Court Plaintiff's Exhibit Number 3, which is the proposed amendment.  And we move for the admission of Plaintiff's Exhibit 3.

(Plaintiff's Exhibit No. 3 offered.)

MR. STERLING:  May I see it?

MR. GOTTFRIED:  Yes.

MR. STERLING:  I just want to make sure.  I have no objection, Your Honor.

THE COURT:  All right.  Thank you.  Plaintiff's Exhibit 3 is admitted.

(Plaintiff's Exhibit No. 3 admitted.)

MR. GOTTFRIED:  And, Your Honor, I'm also hoping that we can stipulate that notice to all of the residents of the proposed amendment was not given.  It's actually a judicial admission in paragraph 12 of defendant's answer and counter-claim where they state, defendants admit that the facts set forth in paragraph 20 of the plaintiff's petition are true and correct, same and except all lot owners but six were given at least 30 days notice in writing of the proposed amendment and the web sites were up for at least 30 days in writing showing the proposed amendment.

And they say, on information and belief, those six received 30 days notice in writing by reading

from the web sites, which is not the provision of written notice as required under the deed restriction.

MR. STERLING: Your Honor, I'll stand by what he read.

THE COURT: Okay. Well, then, the Court will note and make part of the record that provision 12 in defendant's original answer is admitted to by the defendant's counsel.

MR. STERLING: With those exceptions.

THE COURT: With the exceptions that are noted.

MR. Gottfried: Your Honor, we would call Janice Cox.

THE COURT: Ms. Cox.

**JANICE COX,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. GOTTFRIED:

Q. Good morning, Ms. Cox.

A. Good morning.

Q. Could you please state your full name for the record?

A. Janice K. Cox.

Q. And what is your home address?

A. 18940 Peckham Drive.

Q. And are you a resident of Point Venture Section Three-1?

A. Yes, sir.

Q. And you oppose short-term rentals in your subdivision; is that correct?

A. Yes.

Q. And you've authored a web site that you put up entitled Point Venture Neighbors; is that correct?

A. No.

Q. Have you put together a web site as part of your effort to ban short-term rentals in the subdivision?

A. Yes.

Q. What is the name of that web site?

A. There's two web sites. SaveSection3-1.org. There's -- it's sort of a joint web site, pvstrreform.com.

Q. And are you the owner of both of those web sites?

A. Yes.

Q. Who were the other neighbors that are part of that organization that is trying to ban short-term rentals in the subdivision?

A. I can't go through the entire list. I don't have it in front of me. Pepper would be one.

Q.   I'm sorry?

A.   Helen Ramsey would be one.

Q.   Who is Helen Ramsey?

A.   She lives with me.

Q.   Are there more than three people that are part of the, quote, neighbors --

A.   No.

Q.   No?

A.   No.

Q.   So you can only name yourself and Ms. Ramsey?

A.   Correct.  Yes.

Q.   And I'd like to refer you to Plaintiff's Exhibit Number 3, which I believe -- is that the amendment to the deed restrictions that you've been circulating within the subdivision?

A.   The back page is blank but, yes.  Page 1 and 2, yes.

Q.   What do you mean by "the back page is blank"?

A.   If it was for a specific lot, the lot would be filled in and the name would be filled in.

Q.   Oh, okay.  What I'm really asking, is this the form of the amendment that you're asking your neighbors to sign?

A.   Yes.

Q.   Okay.  And under this proposed amendment,

short-term rentals of less than 90 days would be forbidden in the subdivision; is that correct?

A.   Yes.

Q.   Who is the developer of the subdivision currently?  Is there one?

A.   I would believe the -- I guess it was the Mitchell Group originally, and then that passes down to the ACC or POA.  Don't know.

Q.   To your knowledge, do any -- does any developer still own any lots within the subdivision?

A.   I can't answer that yes or no.

Q.   You simply don't know?

A.   I don't know.

Q.   Did you provide 30 days written notice to all of the members of the subdivision of your proposed amendment to the deed restrictions, which are Plaintiff's Exhibit Number 3?

A.   All but -- all but seven.

Q.   And how did you pick the seven that you were not going to provide notice to?

A.   They own short-term rentals.

Q.   So is it fair to say that that was a concerted effort by you to exclude them from the dialogue regarding the amendment that you were proposing for the subdivision?

A. One, we didn't think they would sign it. Two, we had some elderly people in the subdivision, and we were afraid they -- we were afraid of harassment.

Q. And so based on those reasons, you specifically excluded, what was it, six or seven of the residents?

A. Seven.

MR. GOTTFRIED: May I approach the witness?

THE COURT: Yes. Thank you.

Q. (BY MR. GOTTFRIED) Ms. Cox, I've handed you what's been marked as Plaintiff's Exhibit Number 4 and ask you if you can identify it?

A. What do you want?

Q. Can you identify Plaintiff's Exhibit Number 4?

A. Yes.

Q. What is Plaintiff's Exhibit Number 4?

A. The number of mailouts when they were done.

Q. Is Exhibit Number 4 a document that you created?

A. I believe, yes. I didn't, but I believe Helen Ramsey did.

Q. And you were subpoenaed to be here today as a witness, correct?

A. Yes.

Q. And you produced certain documents pursuant to

that subpoena; is that correct?

A.    This was not one of them.  This document, I don't believe was on the subpoena.

Q.    Would you agree with me that that was a document that was produced to me today by your lawyer?

A.    Yes.

MR. GOTTFRIED:  Your Honor, we move for the admission of Plaintiff's Exhibit Number 4.

(Plaintiff's Exhibit No. 4 offered.)

MR. STERLING:  I don't really have an objection to it, Your Honor.  I would say my client produced certain documents in relationship to the subpoena that was given, and there has been some confusion with her about what that entailed.  But I think that qualifies as one of the documents -- as a document that they requested.

THE COURT:  All right.  So no objection.  So Plaintiff's Exhibit 4 is admitted.

(Plaintiff's Exhibit No. 4 admitted.)

Q.    (BY MR. GOTTFRIED)  And Ms. Cox, there are two Post-it notes on Plaintiff's Exhibit Number 4.  Do you see them?

A.    Uh-huh.

Q.    Are those your handwriting?

A.    No, sir.

Q.    Do you recognize the handwriting?

A.    Yes.

Q.    Whose handwriting is it?

A.    Helen Ramsey's.

Q.    Are you aware -- do you have any personal knowledge of the existence of an architectural control authority within your subdivision?

A.    Yes.  I believe it's a committee.

Q.    And who are the members of that committee?

A.    Two that I know of are Stan Retriman (ph) and Cindy Clemmons.

Q.    What about Eugene Glass, would he be a member?

A.    I don't know if he is currently, but he has been in the past.

Q.    Marvin Ruthridge?  Are you familiar with --

A.    I know the name.  Don't know if he certainly sits on the ACC.

Q.    And Greg McConnel?

A.    Don't recognize the name.

Q.    But you do have personal knowledge that an architectural control authority does exist and is operating or committee is operating within your subdivision?

A.    Yes.

Q.    Did you submit your proposed amendment to that

architectural control authority before you started circulating it for signatures?

A. No.

Q. So you would agree with me that since you never submitted it, there was never a recommendation by the architectural control authority that the amendment be adopted by the members; is that correct?

A. Yes.

MR. Gottfried: We'll pass the witness, Your Honor.

THE COURT: All right. Thank you. Counsel.

**CROSS-EXAMINATION**

BY MR. STERLING:

Q. Ms. Cox, in connection with your living at the -- on the lot, are you the owner of the lot?

A. Yes.

Q. Is Ms. Ramsey also an owner?

A. Yes.

Q. So you own it jointly together; is that correct?

A. Yes.

Q. And in the course of -- how long have you owned it or how long have you actually lived on the lot?

A. I believe it's three years.

Q. And during that period of time -- well, scratch that.

Do the Jacksons, the plaintiffs, own any lots nearby?

A. Yes.

Q. They own one near you?

A. Yes.

Q. Is it a next door neighbor-type situation?

A. Yes.

Q. And have you or -- to your personal knowledge, do you know whether they're renting out or leasing the improvements on their lot?

A. Yes.

Q. Have you seen the renters on the lot?

A. Yes.

Q. Have the Jacksons used, at least in the past, a manager for the lot or for that lot?

A. Yes and no. They use the BRBO at current times.

Q. Okay. But did they use this individual in the past?

A. Can you clarify "for"?

Q. Well, was there -- did they have someone other than Mr. and Mrs. Jackson themselves act as their manager of the rental?

A.    I believe very early on they did.  They used the company in Lago.

Q.    Do they have any on-site managers now?

A.    They did.  I think the neighbor was actually part of the caretaker --

Q.    Arrangement?

A.    -- arrangement.

Q.    And did you ever have any problems with the renters or the managers?

A.    Yes.

MR. GOTTFRIED:  Objection, Your Honor. I'm going to object to the relevance.  We're here about notice.

MR. STERLING:  Your Honor, we're not just here about notice.  I have an affirmative defense that goes to the invitation of clean hands doctrine which replies to this temporary injunction, and I filed an answer that actually has that in writing.  I'm entitled to go into that.

THE COURT:  I'm going to allow a little bit of leeway here, not a whole lot, just enough to handle this injunction.  So you may proceed.

Q.    (MR. STERLING)  Have you had any problems with the use or -- problem with the renters or the managers in connection with the short-term rental being used on

the lot?

A.   Yes.

Q.   Could you describe for us what kind of problems you've had?

A.   We've had disorderly conduct.  We've had lewd profanity.  We've had people dancing on the roofs.  We've had people trespassing.  We've had vandalism.  We've had continuing loss of sleep.  We've had bongo drums.  We've had karaoke music.  We've had -- I mean, it's endless.

We have people parking in our driveway.  We have people turning around in our driveway.  We have people trespassing.  Just Christmas I was out of town, we have people standing there and drinking beer in our driveway.  Their kids are in our -- we can see from our cameras we're being notified.  They come over in 10s or 15s at a time asking questions.  It's been a basic nightmare.

Q.   Have you had to call the police?

A.   Yes, sir.

Q.   And have there been -- have your other neighbors complained about the same activities?

A.   Yes, sir.

Q.   Would it be fair to say that the existence of the short-term rental business on the lot has become an

annoyance or a nuisance in the neighborhood?

A. Yes, sir.

Q. I'm going to show you what's been marked as Defendant's Exhibit 1.

THE COURT: Why don't you go ahead and show it to opposing counsel first. Thank you.

Q. (BY MR. STERLING) Let me show you what's been marked as Defendant's Exhibit 1 and ask you is that a printout from a web site service that allows for advertising short-term vacation rentals?

A. Yes, sir.

Q. And is that -- if you looked at it completely and fairly, is that describing pictures and all the Jackson's property?

A. Yes, sir.

Q. And does it have a picture of the two of them as the owners?

A. Yes, sir.

MR. STERLING: We offer Defendant's Exhibit 1.

(Defendant's Exhibit No. 1 offered.)

MR. GOTTFRIED: Your Honor, we object on the grounds of relevancy. Leasing, even short-term leasing, is permitted under the current restrictions. It's not really an issue in this case what they're using

their property for.

MR. STERLING: Actually, Your Honor, it's not. One of the things that I brought up in my pleading is that there is a section of the restrictive covenants, which is Article or Roman Numeral 4, Section -- or Paragraph 5, which basically prohibits the renting of any improvements on a lot without the prior consent of the architectural control authority.

MR. GOTTFRIED: Your Honor, I don't think that that's what it says. I think it says without the authority of the developer and there currently is no developer. And if the defendants are taking the position that the deed restrictions prevent all leasing of any kind for any duration in this subdivision, that's something I'd love to get on the record.

THE COURT: Okay. I'm going to allow Defendant's Exhibit 1. It's admitted.

(Defendant's Exhibit No. 1 admitted.)

THE COURT: I'm going to remind you, gentlemen, that we are here simply on a temporary injunction. I'm not going into the leads of your final hearing on this.

I understand you-all wanting to go ahead and get it out. If you-all want free discovery and you want to have a reporter type everything out now, that's

absolutely fine with me and I'm sure for her. But I'm going to allow Defendant's Exhibit 1. But I'm going to remind you why we're here. All right. Please proceed.

MR. STERLING: I'll pass the witness.

THE COURT: All right. Thank you.

Anything else?

**REDIRECT EXAMINATION**

Q. (BY MR. GOTTFRIED) Ms. Cox, is it your position that all leasing of any kind within the subdivision is prohibited by the deed restrictions?

A. Yes.

MR. GOTTFRIED: We'll pass the witness.

**RECROSS-EXAMINATION**

Q. (BY MR. STERLING) Ms. Cox, would it also be your understanding that prohibiting of the renting within the subdivision is subject to the exception by approval of the architectural control authority?

A. Yes.

MR. GOTTFRIED: Your Honor, I'm going to object to the leading and, actually, it's not what the document says.

THE COURT: That's sustained.

Q. (BY MR. STERLIING) Ms. Cox, the individual restrictive covenants provides for the developer to basically sign away his rights to an architectural

control authority; is that correct?

MR. GOTTFRIED:  Objection; leading.

THE COURT:  Sustained.

MR. STERLING:  Pass the witness.

MR. GOTTFRIED:  Nothing further.

THE COURT:  All right.  You may step down.

MR. GOTTFRIED:  Your Honor, we would call Helen Ramsey.

THE COURT:  Ms. Ramsey.

**HELEN RAMSEY,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. GOTTFRIED:

Q.   Good morning, Ms. Ramsey.

A.   Good morning.

Q.   Could you please state your full name for the record?

A.   Helen Ramsey, Jr.

Q.   And where do you reside?

A.   18940 Peckham.

Q.   And do you live there with Janice Cox?

A.   I do.

Q.   And so you are a resident of Point Venture Section Three-1; is that correct?

A.   Three-1 is correct.

Q. Okay. And you oppose short-term rentals in your subdivision?

A. In Section Three-1, correct.

Q. Okay. And did you, together with Ms. Cox, put together the web site entitled neighbors -- the Point Venture Neighbors -- what's the name of the web site you and Ms. Cox started?

A. Ms. Cox started the web site. I did not. It's pvstrreform.com and savesection3-1.

Q. Other than two of you, has anyone else joined in that group of neighbors as you define it in your -- in the web site?

A. No, sir.

Q. So it's just the two of you?

A. It's just the two of us.

Q. Do you have Plaintiff's Exhibit Number 4 in front of you?

A. I do.

Q. And the two Post-its on Plaintiff's Exhibit Number 4, are those your handwriting?

A. Yes, sir.

Q. Could you please read them both loud for the Court?

A. I can. Kathy is a member at the Point Venture Renters Association and so are -- as are other STR

owners in Section Three-1. They obviously were aware of the amendment by 2-3-17. That's the first one.

Second one says, didn't send mailout to STR and friends because of history of harassment we have endured and didn't want to waste a stamp.

Q. So you were present in the courtroom for Ms. Cox's testimony, correct?

A. Correct.

Q. And you agree that neither you nor Ms. Cox sent notice to all the members of the subdivision that you were seeking the amendment that is Plaintiff's Exhibit Number 3?

A. Correct. Seven were excluded.

Q. And those seven that were excluded, that wasn't just inadvertence. They were purposely left off the list of who got the notice, correct?

A. That's true. We decided that we did not want to endure -- we wanted to hold off the harassment that -- we didn't want to it escalate.

Q. Is it your position that all leasing within the subdivision of any duration is prohibited under the deed restrictions?

A. I don't know how to interpret that really. I think the Court needs to interpret that. I don't know.

Q. I'm asking for your position.

A. I don't have a position on it. I don't have a position on it. I'm not sure I can interpret that in the reading of the deed restrictions. I'll leave that to the lawyers and the...

Q. Do you oppose leasing of any duration in the subdivision?

A. No, sir.

MR. GOTTFRIED: Pass the witness, Your Honor.

THE COURT: Thank you.

**CROSS-EXAMINATION**

BY MR. STERLING:

Q. Ms. Ramsey, did you check the controller's office as to whether or not hotel tax is being paid by the Jacksons?

MR. GOTTFRIED: Objection, Your Honor. Calls for hearsay. And objection on the grounds of relevance.

THE COURT: That's sustained.

Q. (BY MR. STERLING) Do you agree with Ms. Cox's characterization of the problems that the short-term rental caused in the neighborhood?

A. Yes, sir.

Q. Is there any doubt in your mind that this would all end the Jacksons are running a short-term rental

business on their lot?

MR. GOTTFRIED: Your Honor, I object to the relevancy.

THE COURT: Overruled.

THE WITNESS: No, there's -- no, sir.

MR. STERLING: Pass the witness.

MR. GOTTFRIED: Nothing further, Your Honor.

THE COURT: Thank you, ma'am. You may step down.

MR. GOTTFRIED: Your Honor, we would call Kathleen Woodall.

THE COURT: Ms. Woodall, come around and let me swear you in.

**KATHLEEN WOODALL,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. GOTTFRIED:

Q. Good morning, Ms. Woodall.

A. Hello.

Q. Can you please state your full name for the Court?

A. Kathleen Kolb Woodall.

Q. And what is your address?

A. 18920 Peckham Drive.

Q. And is that a property within Point Venture Section Three-1?

A. Yes.

Q. And how long have you owned that property?

A. Since late October, I think, 2004.

Q. And are you a full-time or part-time resident there?

A. I split my time, but it's my primary residence.

Q. When you are not residing there, do you rent out that property?

A. Yes.

Q. And for what periods of time do you typically rent it out?

A. Between two and 21 days.

Q. And how many years have you been renting it out?

A. I began renting it last year -- mid-year of 2016.

Q. Were you provided with written notice of the proposed amendment that is Plaintiff's Exhibit Number 3?

A. No.

Q. How did you learn about the proposed amount?

A. I received an e-mail from another resident notifying me saying -- with a link to the web site.

Q. And did you know at that time who was proposing

the amendment?

A. No.

Q. Was -- have you ever been given an opportunity to speak at a meeting regarding the proposed amendment?

A. No.

Q. Are you aware of the existence of an architectural control authority within the subdivision?

A. Yes.

Q. And explain for the Court what your familiarity is with that architectural control committee, what do they do, and if you know any of the members.

A. I know that Stan Retriman is a member, and I know that it is a committee created by way of the owners' association, and that they have some broad duties that include the review of development of plans and building plans and administration of that.

Q. Are you aware of any architectural control authority recommendation one way or the other related to the proposed amendment that's Plaintiff's Exhibit Number 3?

A. There was none.

Q. Do you oppose the proposed amendment that is Plaintiff's Exhibit Number 3?

A. I would not sign it.

Q. Are you familiar with the history -- with the

developer history out there in Point Venture?

A. Yes.

Q. Explain for the Court what your understanding is of the developer history out there.

A. My understanding is that there were several developers over time from the inception of the community that experienced financial difficulties and some bankruptcies with the final group of lots being vested with the Point Venture POA which they disposed of to private owners over time and they do not own anymore.

Q. So your understanding is that there are no -- that there is currently no developer as that term is defined within the deed restrictions currently?

A. Correct.

Q. How would the proposed amendment, Plaintiff's Exhibit Number 3, affect your property rights?

A. Well, I would be restricted from not only short-term rentals, but it would restrict me from the potential of renting on a longer term because I would not be able to maintain a tenant in a holdover status on a lease for month to month. And my property is currently for sale which would impact the value because it sets my title separate and different from others in the neighborhood impacting the way it would be viewed by the open market.

MR. GOTTFRIED:  I'll pass the witness.

**CROSS-EXAMINATION**

BY MR. STERLING:

Q.    Ms. Woodall, do you pay hotel tax?

A.    Yes.

Q.    In relationship to your short-term rental?

A.    Yes.

Q.    And have you been, in the past, an advocate for regulation of short-term rentals?

A.    I have advocated for the Village of Point Venture to enforce ordnances for everyone and to potentially permit STRs in the neighborhood through the Village of Point Venture.

Q.    And isn't it true that you said in a Point Venture meeting, October 7, 2015, that you felt that VRBOs are causing property values to decrease?

A.    I don't recall if that was the total of my statement.  It may have been a part of a statement I made which was lengthy.

Q.    Okay.  Would it surprise you that it's part of a Point Venture minutes of that meeting?

A.    The minutes of the meeting do not include my full statement, which was submitted to the board and asked to be appended to the minutes.

Q.    But that is substantially something you said

during that meeting; is that correct?

A. They were the minutes approved by the board. It's was not my full statement.

Q. Okay. Did you say that VRBOs would -- what does VRBO mean?

A. Vacation rental by owner.

Q. Okay.

-- was causing property values to decrease?

MR. GOTTFRIED: Objection, Your Honor, asked and answered.

THE COURT: Sustained.

Q. (BY MR. STERLING) Were you aware of a provision in the 1972 restrictions, Article -- Roman Numeral 4 of 5 where it says, the renting or leasing of any improvement thereon or a portion thereof without the prior consent of the developer is prohibited?

A. I was provided with a copy of the deed restrictions when I bought my first house in Point Venture in 2002 and my second in 2004. I had not read them until after the amendment was submitted. I had not read them in sometime.

Q. And when you read them at the time that you were called upon to think about what it actually says, because of the existence of amendment being floated

around for signature, did you read that in the restrictive covenants?

A.    That paragraph was not the object of my focus.

Q.    Okay.  Were you aware that no lot of the subdivision shall be used for commercial, business or professional purpose nor for church purpose?

A.    I have been aware --

MR. GOTTFRIED:  Objection, Your Honor, relevancy.

THE COURT:  Overruled.

Q.    (BY MR. STERLING)  Were you aware that all lots in the subdivision were to be used for single-family residences purposes only?

A.    Yes.

Q.    Were you aware that no noxious or offensive activity of any sort shall be permitted, nor shall anything be done on any lot which may be or become an annoyance or nuisance to the neighborhood?

A.    Yes.

Q.    Did you have a conversation with Janice Cox on or about April 30, 2016, in which you indicated you were going to join the other side, you were going to become a joint short-term renter -- short-term business?

A.    I don't consider it us or them.

MR. GOTTFRIED:  Your Honor, I'm going

object to relevancy.

THE COURT: Overruled.

Q. (BY MR. STERLING) You can answer.

A. I do not consider it joining the other side. I recall a conversation where I informed Janice that I was going to begin using my house as a short-term rental.

Q. Was that the day of the -- of a man who was dancing on a roof?

A. No. I really don't know.

MR. STERLING: Pass the witness.

THE COURT: Thank you.

**REDIRECT EXAMINATION**

Q. (BY MR. GOTTFRIED) Ms. Woodall, could I direct your attention to Plaintiff's Exhibit Number 1?

MR. GOTTFRIED: Which is the plat, Your Honor.

Q. (BY MR. GOTTFRIED) Can you point out to the Court the section of that plat which is Point Venture, Section Three-1?

A. Sure.

MR. STERLING: Could we approach, Your Honor?

THE COURT: Yes, of course. Thank you.

THE WITNESS: It roughly is -- this is not a complete plat because there are homes down here, but

it goes roughly down lake front and then it comes around and comes back up here. And along this side all the way up here through Kelly and along Venture Drive and back down here. And my home is here. This is the defendant, the Jacksons.

Q. (BY MR. GOTTFRIED) And where is the lake?

A. The lake is here. These are waterfront homes, and the lake is here. This is very -- it's vertical.

MR. STERLING: Could I ask just one question for clarity?

This is the whole of Section Three-1, isn't it? Doesn't show anything else?

THE WITNESS: I believe that's correct. I don't know where the Three-1 stops here on lake front, you know, right along this road so I assume this to be correct.

MR. GOTTFRIED: We'll pass the witness, Your Honor.

MR. STERLING: I pass the witness.

THE COURT: All right. Thank you.

MR. GOTTFRIED: Your Honor, we have six other witnesses, but I think we're going to rest.

THE COURT: All right. Let me let her get off.

You may step down.

MR. GOTTFRIED: In light of the testimony so far, I think we can dispense with the other witnesses.

THE COURT: Yeah, but they paid for parking down here and tried to find a spot.

MR. GOTTFRIED: If they really want to get their time on the stand, I could do it.

THE COURT: It's entirely up to you.

MR. GOTTFRIED: We'll rest, Your Honor.

THE COURT: All right. Thank you. Counsel.

MR. STERLING: Your Honor, I don't know that we have anything further to put on because he called our witnesses. I got what I wanted out of them.

THE COURT: Okay. Very good.

If you-all want to give me a closing argument for this particular phase of this matter, I can take it if you-all want to give it.

MR. SUTTON: Judge, I'd like to make a brief closing. I need about five minutes.

THE COURT: All right. You're going to need five minutes to do it or you need a five-minute break?

MR. SUTTON: If you'd like to take a break, I'm fine.

THE COURT: No, I'm good.

**CLOSING ARGUMENT BY PLAINTIFF**

MR. SUTTON: Okay. Judge, I'd like to direction your attention to Plaintiff's Exhibit 2, which is the deed restrictions.

What I'd like to do is orient you to the two or three key provisions, and then I'm going to offer you some cases that will guide you in your interpretation this morning.

On page 2, number page 2 of the deed restrictions is one of the clauses implicated today. It's called the Duration clause. And I agree the title of these provisions are not controlling.

And I will summarize that what the Duration clause says is, first, for a 35-year period and then on 10-year anniversaries thereafter, a majority of owners -- not two-thirds, but just over 50 percent -- are empowered to change the provisions hereof in whole or part.

So we know that there are circumstances under which the percentage required is, I'm going to say, 51 percent instead of 67 percent.

Now, I'm going to skip over a clause that's on the next page and come back to it because I want to stick to the subject matter of amendment.

If you go to the second to the last page there is Article 9, IX, called Amendments. This is a stand-alone clause which says that any or all of the amendments may be annulled, amended, or modified at any time at the recommendation of the architectural control authority by a vote of two-thirds.

That is one sentence. Irrespective of the 35- and 10-year anniversaries, there is a separate procedure involving architectural control authority where a two-thirds vote suffices.

Now, we get into the difficulty which is the next two sentences, which are stand-alone sentences.

All such lot owners shall be given 30 days notice in writing of any proposed amendment before it is adopted.

Then, finally, there shall be no annulment, amendment, or modification of these covenants without the prior recommendation of the architectural control authority.

So we have two clauses which have -- I will call complimentary provisions, but there is a conflict as to the percentage required if you want to call it a conflict.

This presents a problem for the Court because you've got two clauses that deal with some of

the same subject matter. One of which imposes some additional requirements. It is very easy, Judge, to harmonize these provisions without resorting to any tiebreaker rule. The harmonization is that there are circumstances under which a lower voting threshold is possible, and that's on these anniversary dates. However, nothing in that first clause says, and you can do that without notice or you can do that without the recommendation of the architectural control authority. To harmonize the two, you simply add those procedural due process requirements to the first clause and, thereby, you have given effect to every word in this document.

I will cite to the Court the broad principles announced in two cases as to how you interpret deed restrictions. One is a case from --

And if I may, I'll give the Court copies of these.

One is a case relating to deed restrictions, particularly from 2015. It's called Zgabay, Z-G-A-B-A-Y. And the other case called Forbau, F-O-R-B-A-U.

And I will give opposing counsel copies of these.

Summarized briefly, these two cases hold

as follows: Forbau, the older case, is a general contract interpretation case. And it says that the court needs to give effect to every provision in a contract and specific clauses control over general. The Zagbay case, a 2015 case, relates specifically to deed restrictions. And this is an important case for the third appellant district.

It says as follows: If the court finds there is any ambiguity between two deed restrictions or any ambiguity in deed restrictions, there is a tiebreaker rule. The deed restricts are interpreted to favor the free and unrestricted use of property.

Judge, you, therefore, have two ways to answer the -- to interpret this conflict or this harmonization in our favor. One, without resort to a tiebreaker rule that you can harmonize the two provisions. Second, that under the rule in Zgabay if you have any doubt what to do, what you have to do is favor the free and unrestricted use of property.

There is one narrow sense in which whether leasing is allowed in this subdivision is relevant. And the only sense in which it's relevant is as follows: Does the amendment that has been put into evidence seek to restrict property rights?

The reason that it does, Judge, is because

it expressly bans, without exception, rentals by duration. A minimum duration of 90 days is required for rentals.

And what I'll do is point to the Court to another page of the deed restrictions, page 6, at the bottom of the page.

Paragraph 5, the renting or leasing of any improvements without the prior written consent of developer is prohibited.

Well, let's state that another way. Renting is allowed with the prior consent of the developer. We don't have to address today whether renting is, in fact, allowed. All the Court has to address is whether the proposed amendment would restrict renting to the extent it is allowed. And the answer is plainly yes. The whole point of the amendment to the deed restrictions is to restrict property rights.

Judge, if you have any doubt at all what these two different provisions mean, if you find there's an ambiguity or any doubt, you're going to interpret the deed restrictions in favor of my clients, the rent for short terms and who oppose the amendment.

Finally, Judge, I'd like to address a procedural issue of what we have to show today for this injunction.

This is on page 3, the Enforcement clause.

I believe that this is the broadest enforcement clause I've ever encountered in 10 years of HOA litigation. Probably explained by this being a fairly old deed restrictions.

It says as follows, and I'll summarize: Any attempted -- any violation or attempted violation is subject to legal or equitable action. And it doesn't say by an owner, but the implication is that someone with standing can bring a case for damages or an injunction.

And then it says, you can see either a mandatory or prohibitory injunction for any violation or attempted violation, and it is not a prerequisite to the granting of an injunction to show inadequacy of the legal remedy or irreparable harm.

The only thing my clients have to show today to get an injunction is that the defendants have violated or attempted to violate the restrictive covenants by going out and getting an amendment -- seeking an amendment without written notice or architectural control recommendation. Both of those facts were established in the testimony.

The common law of Texas already provides that irreparable injury need not be shown in any deed

restriction case in any event.

And I'll give the Court the authority for that. What I've done is provided the Court with a newer case, *Reed versus Reed*, which summarizes the state of law as of 2016 on that.

The defendants are going to argue that the rest -- the other requirement -- or the other allowance of the deed restriction is that you can seek an injunction without a showing of an inadequacy of legal remedy. They're going to argue that that contract clause is not enforceable. So to address that, I have a case for the Court --

Excuse me just one minute, Judge.

I should say the defendants cite a case from 1870 which has nothing to do with that issue. I have two cases for the Court, more modern cases. One is called Doyle and the other is called Inwood.

Judge, the Doyle and Inwood cases do as follows: The Doyle case says that parties can agree by contract to any remedy and if it doesn't violate public policy, the courts will enforce it.

The Inwood case is really a watershed case relating to just how much power homeowners associations have under deed restrictions. And I will offer the Court by analogy the following: The Texas Constitution

forbids foreclosures of homesteads. There are eight enumerated exceptions.

There is no exception allowing a homeowners association to foreclose a homestead and yet the Texas Constitution is overridden by deed restrictions because, as the Inwood case says, if a deed restriction says that a homeowners association can take your house away, the deed restrictions remedy controls.

I can't think of a stronger statement as to how much power there is in recorded deed restrictions as having your house taken away for not paying your monthly assessment.

Defendants are going to argue that we don't get the benefit of this enforcement clause, that it's not enforceable because it somehow conflicts with state law. That's simply not the case. This enforcement clause should be enforced as written. The only thing we have to prove today is that there is a breach -- attempted breach of the deed restrictions.

Finally, Judge, the defendants have made too much of the potential harm that they would suffer. The injunction asks that any deed restriction -- that any amendment that they may get a 51 percent vote for not be recorded until final judgment. They may well get their 51 percent vote, Judge. All we're saying is it

can't be recorded until this lawsuit has been decided so that there won't be limitations on my client's rights, clouds on their title, and most importantly, they won't be subject to lawsuits by 20 or 30 or 40 or 50 owners while they're renting to short terms.

Thank you, Judge.

THE COURT: Thank you.

Counsel.

**CLOSING ARGUMENT BY DEFENDANT**

MR. STERLING: Your Honor, I'm going to kind of go -- work backwards of what counsel talked about.

Last thing he said was about how structuring the temporary injunction and that it's not going to be that inconvenient, they can go on and get their majority but that somehow just being prevented from going ahead and filing it, recording it, is not going to cause or cause any damage to my client. Well, it will cause damage because it won't be effective. It's going to change the effective date of it without even getting an actual hearing on the merits.

It was going to be a situation -- if they're ordered not to record it that they will end up in a situation where they just want -- if they get it -- get the final amount of signatures they need, they'll

end up recording it in the next 10-year period and that means it would be effective until the 10-year period after that. And it seems to me that's a wrong way about going about doing any kind of -- keeping and maintaining the status quo. It's not doing that at all. At the very least, it should have allowed us to go ahead with it. You record it if you want to. You can even have an injunction prohibiting people from enforcing it after it's been recorded just so we could go ahead and get it done.

They have a legal remedy, which is the Declaratory Judgment Act, they can invoke. They do have a legal remedy. And I think they ought to be compelled to use that legal remedy itself. They can clearly get a declaration that is void if that's what they want to do.

Now, there's been a lot of talk about not having a chance to read everything counsel has given me. But the way he structured his argument makes me think that there is still not a direct case that says, gee whiz, you can get rid of or you do not have to have a -- that fourth point of proof in a temporary injunction situation involving restrictive covenants. That is, showing of an inadequacy of your legal remedy. I think that you do.

One of the things that I think that is --

I know I cited a case that's fairly old, but I like the language in it and the language in it is basically that your state is not really a party to the contract. The case I cited was *Moore versus Letchford*. It's 19- or 1871.

But it basically is saying that while it's required to give adequate process for the enforcement of rights, you can't tie the state's hands on how they're going to go about proving it.

And that's the point I'm trying to basically say. They're basically changing the evidentiary rules of the court, and I don't think they get away with doing that by putting it in their contract in the restrictive covenants.

Now, let's go, I think, to the situation that I tried to raise, and I think there's evidence of it in what you've heard. And that is, essentially, you've got to come into the court with clean hands. And they haven't come into court with clean hands. They have shown and they have admitted that they're violating certain restrictive covenants themselves. And it's pretty clear that if they're saying, you know, gee whiz, the only exception can be a developer and that developer's rights aren't moving on to the HOA, then they can't change it at all and renting at all.

And there are other things that they're violating in terms of running a business on the lot. They're running what amounts to annoyance or nuisance activity on the lots. All of that is happening, and they're violating all those things.

And the reason I brought them up in this temporary injunction hearing is because these are all centered around the issue about short-term rentals. And in the situation where you're talking about the same subject matter -- that's what we're talking about -- the ultimate goal on both sides is fighting over the existence or nonexistence and the continued existence of short-term rental rights. And I think that you cannot permit them to get a temporary injunction when their hands are as dirty as they are in this situation.

So let's go, I think, now to actually talking about the restrictive covenants.

Now, one of the things that counsel referred to was a case. And one of the cases it cited was *Coker versus Coker,* which is a Supreme Court case. And it's cited by one of his references.

And that particular case is talking about how you use contract interpretation rules on any contract, not just a restrictive covenants contract. And it's clear that the usual principles of contract

principles are supposed to be done by or applied by the court to any contract which includes restrictive covenants, which is just another form of a contract.

But one of the things it says, basically, is that in harmonizing contract provisions, terms stated earlier in an agreement must be favored over subsequent terms. And our term is way in front of this contract. The term they're pushing is way in the back of the contract. It's possible to harmonize that without any real problem at all, and harmonizing it is the developer providing two separate methods of initiating and providing for amendments or changes to the restrictive covenants.

One is a grassroots method that's done without voting where you have a majority of people running around collecting signatures. Usually that's going to be somebody like my clients pushing to get an amendment of some sort. Essentially petitioning to get their actual amendment. And there are -- if you read the rules of the statutes about restrictive covenants, there are provisions in there for doing exactly that. Similar to what is being done -- provided for in the 1972 restrictions themselves.

And the 1972 restrictions were done before those statutes probably even went into effect. So it's

showing that there's one way of doing it and then there's going to be another way of doing it. And the other way of doing it is doing it using the HOA or the architectural control authority, essentially, which is a committee, apparently, of the current HOA.

But you see the difference. One, it's got -- one has bare majority. The other one has two-thirds. One require as vote. The other one just requires signatures. One requires notice. The other one doesn't require notice. One requires -- and it would be superfluous to have notice when you're running around going to each person door to door trying to get them to sign on to the actual instrument that you want to sign or want to record.

And it doesn't require the architectural control authority to give us permission or a recommendation.

So it's just two separate things that work separately, and you can harmonize it as being that.

Now, the thing that I'm concerned with is one of the things that counsel said was because of the type of amendment that we requested, which would supposedly restrict the -- what is currently in the restrictive covenants, which may not be exactly true. It may actually be opening up if you ban all leasing and

we now have another thing that allows leasing or only bans a portion of leasing. It seems to me that that is opening up. But in any case, they're characterizing as being restrictive.

But you're not supposed to be looking at the amendment. You're supposed to be looking at -- because what they're fighting about is the amendment processes. And it seems to me the one, if you're going to look at it past trying to harmonize it, you're trying to sit there and say which is the most restrictive.

Their's is the most restrictive. Their's the one who ends up having everything go at two-thirds majority, requiring the actual architectural control authority to do a recommendation prior to getting on a ballot of some sort. That's essentially much more restrictive than what's allowed in the one allowing from a majority of people and lot owners rising up as a group and going ahead and signing off on an instrument that changes and is recorded.

So either way you want to look at it, and I think the proper way is to say that it's not really ambiguous. I think it's pretty straightforward on service. And if you use the normal contract principles, look at the entire four corners of the document, and apply the tiebreaker that I'm talking about, it's pretty

obvious that the one at the head of the line should be given more favor. And we're not doing anything against the other process. All it's doing is being allowed both processes to work together.

So we urge the Court to deny the injunction -- the temporary injunction for all the reasons I've stated.

THE COURT: Thank you.

MR. SUTTON: May I have a brief minute rebuttal, Judge?

THE COURT: Sure.

**FURTHER ARGUMENT BY PLAINTIFF**

MR. SUTTON: Regarding the defense of unclean hands, here is why that argument is erroneous.

There is a confusion in the short-term rental cases by people who oppose them, between an owner's right to rent for any duration versus an owner's breaches of restrictive covenants. And often you have owners who have a right to rent for short terms who have breached the restrictive covenants because they have either caused nuisances or they have had over occupancy violations. Any number of other actionable wrongs for which there are damages and injunction as a remedy.

So the fact that an owner may have violated a restrictive covenant would not mean that the

owner does haven't a property right. And so the error in the analysis here by the defendants is to say that unclean hands would prevent owners from having procedural due process when it comes to amending the deed restrictions.

I can't think of anything that would take that right away from a homeowner unless they -- unless that homeowner had actually themselves sabotaged the amendment process. That's where the unclean hands argument come in.

Second, the evidence was that the defendants actually blocked us from having a voice in this vote, and it's quite apparent why. If you believe that deed restrictions are local, local government, that they are constitutions for subdivisions, then the spirit of this document is that everyone has a voice.

There is a process for them to be involved when deed restrictions are being proposed. I suspect that the architectural control authority will have some words to say if a group of owners, without the architectural control authority's recommendation, have gone and recorded something. I guess we'll see if the injunction is denied.

Finally, the Zgabay opinion relates not to -- not merely to enforcement of a deed restriction in

favor of an owner, but specifically the free and unrestricted use of property. And that's what has to be born in mine.

Another aspect of Zgabay that applies here is that my client's property right is partly bound up with the procedural due process rights they have. They have spent money on land, Judge. That land came with a bundle of rights that are important to these people. They are making rents on their property. The defendants want to take that away without procedural due process. I would ask the Court to keep that in mind for a group of homeowners.

Thank you, Judge.

THE COURT: All right. Thank you.

**FURTHER ARGUMENT BY DEFENDANT**

MR. STERLING: Only thing I would add is it's one thing to talk about procedural due process in a situation about taking away, let's say, a home -- or a HOA has accused you of violating something and you're entitled to a hearing and that kind of stuff. But it's another thing to be talking about procedural due process in the sense of changing the amendments. That's not a matter of due process in a judicial or semi-judicial method.

It's basically, we're talking about two

different methods of changing a particular process. They were aware of it when they bought their property. They should have been aware of it. They are plain to see to read both those two provisions. And the first conclusion any reasonable personal would come to is both those apply. One way -- I can do it this way, or I can do it that way.

THE COURT: All right. Thank you.

All right. I always hate it when judges kind of went off on a tangent when I was practicing law, so I'm going to do that anyway.

I want to ask both attorneys this: Let's say, hypothetically, provision comes up. Petition or a request of the architectural control authority -- I know you guys aren't saying ACA because you don't want to be called the Affordable Care Act -- but anyway, the architectural control committee looks at something, has a proposal, has something but then it has to go through two-thirds to be approved. That's about right.

But before they do that, they've got to give a 30-day notice to those -- to everyone. Is that about right?

Okay. So let's say they do that. And that's approved. What next -- who files the instrument with the property records? Is it signed under the ACA

or is it signed by -- how does that work procedurally?

MR. SUTTON: Judge, I believe I can address that.

THE COURT: Okay.

MR. SUTTON: In this particular set of deed restrictions, we don't have a mandatory HOA in here. But there is this ACC. And the only thing that it says about the ACC in that amendment process is that it makes a recommendation. And that could be recommendation for or against.

The recordation would be a list of signatures attached to an amendment. And that signature would be either 51 percent or two-thirds. And they would be on the back of the recorded instrument.

THE COURT: All right. So is it your argument, then, that after it's approved -- let's say two-thirds agree and they bless the architectural committee's or whatever, ACA, then those two-thirds have to sign the document to get it filed, or does it revert back to Provision 1-4 -- Section 1-4 where you then have to go ahead and just get one-half of everyone to sign off on it?

MR. SUTTON: Our position is that at the stated tenure intervals of the first provision that a relaxed majority requirement is required, and you would

only need 51 percent on that instrument. But outside of those unusual periods, then it's two-thirds and attached -- their signatures attached.

THE COURT: Okay. So that's you-all's position.

What is your view on that?

MR. STERLING: My view is that I really think that when it says recommendation, it means favorable recommendation. Because I think most people when they talk about you're recommending something, it's favorable. If you're not recommending something, it's unfair.

THE COURT: Okay.

MR. STERLING: So I disagree with him on that.

And I think that, practically speaking, that if you had a HOA run a vote on this thing and -- or I should say the architectural control authority, I would think the right thing to do would be to then to file a document that had the amendment on it; cite that it got, you know, 30 days notice; that they had the vote; it was over two-thirds; and they certify to it that the architectural control authority, and only the architectural control authority, have to sign it and record it. A lot simpler.

THE COURT: Do you think that under Section 1, Paragraph 4 that you have to give notice to all of the property owners?

MR. STERLING: No, I don't think so. I think the reason why is that the whole process works differently. You're taking your petition in your hand, or whatever you're calling it, and you're going out and essentially lobbying to get a signature lot by lot. And once you reach your majority, you stop. You don't need to go any further. So I don't think there's a question about having any kind of a need for notice. You're having to lobby each single time you do it.

THE COURT: Okay.

MR. STERLING: That's how you do regular petitions.

THE COURT: All right. Thank you.

All right. I'm going take a 10-minute break, and I'll be back at 10:45 and let you know.

Thank you.

MR. SUTTON: Judge, should I give you our proposed order now?

THE COURT: Yeah, let me see.

Do you have one too?

MR. STERLING: I haven't seen it, and our order would be denied.

THE COURT: Okay. That's fine. Thank you.

(Court in recess.)

THE COURT: By the way, when do you guys want to have this case set for trial? You have to do it in 60 days.

MR. SUTTON: 60 days. I was thinking the end of June. Does that fit with the window?

MR. STERLING: Yeah, probably can be done. I would think somewhere end of June.

MR. SUTTON: I have vacation beginning July 13th.

THE COURT: Okay.

MR. SUTTON: That third week in June, if that's the square on the calendar.

THE COURT: That's a jury week.

MR. SUTTON: I have not pled for a jury.

MR. STERLING: No, I don't see any point in a jury.

MR. SUTTON: We'll do bench.

THE COURT: So the third week of June is actually a jury week.

MR. SUTTON: Forth week in June, then.

THE COURT: June 26th through the 30th.

MR. SUTTON: Agree.

MR. STERLING: I'm sorry, what was it?

THE COURT: June 26th through the 30th is there -- you guys probably don't have your calendars with you.

MR. STERLING: I don't have it with me.

**COURT'S RULING**

THE COURT: All right.

All right. I thought you-all did a fine job. I always appreciate good lawyering. So let me tell all of you that you did fantastic. The clientsshould be pleased no matter what the judge does.

I am concerned in the taking of property rights without due process and without following procedures that are set forth in governing documents for a neighborhood or community. I spent quite a bit of time on this yesterday reading the cases, reading what have been submitted -- or, actually, I looked at yours and then I just saw yours today. But to harmonize the provisions, I think at this point the document -- the deed restrictions, as they're written, provide a process. And I don't think that's been followed.

And so, therefore, I'm granting the temporary injunction as proposed by the plaintiff. We're going to maintain the status quo.

MR. STERLING: Your Honor --

THE COURT: Hold on.

A $10,000 bond that's been previously filed will remain in effect. This will, essentially, require -- will enjoin the defendants from going against what I believe is required, giving 30 days notice, going through the architectural control authority.

We're going to set the case for trial during the week of June 26th through the 30th, 2017, on agreement of counsel.

So, yes, this is prohibiting any further -- well, it actually kind of speaks for itself as to what can and can't be done. I've signed this. You-all can get it filed.

And now, I'm sorry.

MR. SUTTON: Judge, Mr. Sterling has raised an issue that I may not have written clearly that the prior bond cash remain in effect. I wonder if you would like to interline them.

MR. STERLING: Before you do, Your Honor, I wanted an opportunity to at least say that I think that a separate bond should be placed for this particular temporary injunction. I think it ought to be at least $10,000.

THE COURT: You want a separate bond, a different bond? Any particular reason why?

MR. STERLING: I think that the stakes are pretty high in this particular situation. And, effectively, what the Court is doing is going to prevent my client from ever getting this particular amendment in effect for at least 10 years.

MR. SUTTON: Judge, I believe he should have elicited testimony as to the dollar issues relating to the bond and that was not done.

THE COURT: All right. I'm just going to go ahead and interline this prior cash bond.

And if you-all will get together as to a date in that week of June 26th through 30th, I can actually sign a separate order if you-all want that. Okay.

MR. SUTTON: Thank you, Judge.

THE COURT: All right. Thank you very much.

(The proceedings were concluded.)

# PLAINTIFF'S

# EXHIBIT NO. 1

Plat

THE STATE OF TEXAS §

COUNTY OF TRAVIS § KNOW ALL MEN BY THESE PRESENTS:

That Venture Development Company, a Partnership composed of Canfield Land Company, Inc., Cummings Land Company, Inc. and Gaylord Land Company, Inc., each such corporation having its principal place of business in Houston, Harris County, Texas, and Smith Land Company, Inc., having its principal place of business in Austin, Travis County, Texas, each a Texas corporation, being all of the Partners in Venture Development Company (hereinafter called the "Developer"), being the owner of all of that certain tract of land situated in Travis County, Texas, and known as Point Venture, Section Three-1 according to the plat of said subdivision recorded in the Office of the County Clerk of Travis County, Texas, on the 27ᵗʰ day of _March_, 1972, after having been approved as provided by law, and being recorded in Volume _56_ Page _48_ of the Plat Records of Travis County, Texas, to which plat and the record thereof reference is here made for a full and particular description of said land; and the Developer desiring to create and carry out a uniform plan and scheme for the improvement, development and sale of property in said Point Venture, Section Three-1 (herein referred to as "the Subdivision"), does hereby adopt, establish, promulgate and impress the following Reservations, Restrictions and Covenants, which shall be and are hereby made applicable to the Subdivisions:

I.

GENERAL PROVISIONS

Applicability

1. Each Contract, Deed or Deed of Trust which may be hereafter executed with respect to any property in the Subdivision shall be deemed and held to have been executed, delivered and accepted subject to all of the provisions of this instrument, including, without limitation, the Reservations, Restrictions and Covenants herein set forth, regardless of whether or not any of such provisions are set forth in said Contract, Deed or Deed of Trust, and whether or not referred to in any such instrument.

Dedication

2. The streets and roads shown on said recorded plats are dedicated to the use of the public. The utility easements shown thereon are dedicated subject to the reservations hereinafter set forth.

Reservations

3.a. No interest in the oil, gas, or other minerals in, on or under the Property will be conveyed by Developer; all interest in the same being expressly reserved by Developer.

b. The utility easements shown on the recorded plats are dedicated with the reservation that such utility easements are for the use and benefit of any public utility operating in Travis County, Texas, as well as for the benefit of the Developer and the property owners in the Subdivision to allow for the construction, repair, maintenance and operation of a system or systems of electric light and power, telephone lines, gas, water, sanitary sewers, storm

PLAINTIFF'S
EXHIBIT
2

MAR 0 7 2017

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

Dana DeBeauvoir, County Clerk
By Deputy: A. MORALES

DEED RECORDS
Travis County, Texas          1291   1452

sewers and any other utility or service which the Developer may find necessary or proper.

c. The title conveyed to any property in the Subdivision shall not be held or construed to include the title to the water, gas, electricity, telephone, storm sewer or sanitary sewer lines, poles, pipes, conduits or other appurtenances or facilities constructed by the Developer or public utility companies upon, under, along, across or through such public utility easements; and the right (but no obligation) to construct, maintain, repair and operate such systems, utilities, appurtenances and facilities is reserved to the Developer, its successors and assigns.

d. The right to sell or lease such lines, utilities, appurtenances or other facilities to any municipality, governmental agency, public service corporation or other party is hereby expressly reserved to the Developer.

e. The Developer reserves the right to make minor changes in and minor additions to such utility easements for the purpose of more efficiently serving the Subdivision or any property therein.

f. Neither the Developer, nor its successors or assigns, using said utility easements shall be liable for any damage done by any of such parties or any of their agents or employees to shrubbery, trees, flowers or other property of the land owner situated on the land covered by said utility easements.

g. The Developer reserves the right to construct one or more esplanades in the areas where esplanades are shown on the recorded plat. The Developer further reserves the right to improve, landscape, alter, modify and eliminate any one or more of such esplanades (or reinstall one or more of such esplanades) at any time, and from time to time, hereafter.

h. The Developer reserves the right at any time, and from time to time, hereafter to promulgate and impose restrictions (as well as vary and amend any such restrictions) as to all or any portion of the unplatted, reserve or unrestricted areas of the Subdivision identified on the aforesaid plat. Any such action by the Developer shall not, in order to be fully binding, require the joinder of any other person, whether such person be an owner of property in the Subdivision, a lienholder, a mortgagee, a Deed of Trust beneficiary or any other person.

Duration

4. The provisions hereof, including the Reservations, Restrictions and Covenants herein set forth, shall run with the land and shall be binding upon the Developer, its successors and assigns, and all persons or parties claiming under it or them for a period of thirty-five (35) years from the date hereof, at which time all of such provisions shall be automatically extended for successive periods of ten (10) years each, unless prior to the expiration of any such period of thirty-five (35) years or ten (10) years, the then owners of a majority of lots in the Subdivision shall have executed and recorded an instrument changing the provisions hereof, in whole or in part, the provisions of said instrument to become operative at the expiration of the particular period in which such instrument is executed and recorded, whether such particular period be the aforesaid thirty-five (35) year period or any successive ten (10) year period thereafter.

-2-

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

MAR 0 7 2017

Dana DeBeauvoir, County Clerk

By Deputy

A. MORALES

## Enforcement

5. In the event of any violation or attempted violation of any of the provisions hereof, including any of the Reservations, Restrictions or Covenants herein contained, enforcement shall be authorized by any proceedings at law or in equity against any person or persons violating or attempting to violate any of such provisions, including proceedings to restrain or prevent such violation or attempted violation by injunction, whether prohibitive in nature or mandatory in commanding compliance with such provisions; and it shall not be a prerequisite to the granting of any such injunction to show inadequacy of legal remedy or irreparable harm. Likewise, any person entitled to enforce the provisions hereof may recover such damages as such person has sustained by reason of the violation of such provisions. It shall be lawful for the Developer or for any person or persons owning property in the Subdivision (or in any other Section of Point Venture) to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any of such provisions.

## Partial
## Invalidity

6. In the event that any portion of the provisions hereof shall become or be held invalid, whether by reason of abandonment, waiver, estoppel, judicial decision or otherwise, such partial invalidity shall not affect, alter or impair any other provision hereof which was not thereby held invalid; and such other provisions, including Restrictions, Reservations and Covenants shall remain in full force and effect, binding in accordance with their terms.

## Effect of Violations
## on Mortgages

7. No violation of the provisions herein contained, or any portion thereof, shall affect the lien of any Mortgage or Deed of Trust presently or hereafter placed of record or otherwise affect the rights of the Mortgagee under any such Mortgage, holder of any such lien or beneficiary of any such Deed of Trust; and any such Mortgage, lien or Deed of Trust may, nevertheless, be enforced in accordance with its terms, subject, nevertheless, to the provisions herein contained including said Reservations, Restrictions and Covenants.

## II.

## ARCHITECTURAL CONTROL

### Basic Rule

1. No building or other improvement of any character shall be erected or placed, or the erection or placing thereof commenced, or changes made in the design thereof or any addition made thereto or exterior alteration made therein after original construction, on any property in the Subdivision until the obtaining of the necessary approval (as hereinafter provided) of the construction plans and specifications and a plat showing the location of such building or other improvements. Approval shall be granted or withheld based on matters of compliance with the provisions of this instrument, quality of materials, harmony of external design and existing and proposed structures and location with respect to topography and finished grade elevation.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017

Dana DeBeauvoir, County Clerk

By Deputy:

A. MORALES

-3-

1291 1454

Architectural
Control Authority

2.a. The authority to grant or withhold architectural control approval as referred to above is vested in the Developer; except, however, that such authority of the Developer shall cease and terminate upon the election of the Point Venture Architectural Control Committee, in which event such authority shall be vested in and exercised by the Point Venture Architectural Control Committee (as provided in b. below), hereinafter referred to, except as to plans and specifications and plats theretofore submitted to the Developer which shall continue to exercise such authority over all such plans, specifications and plats.

b. At such time as 75% of the lots in the Subdivision and in all other Sections of Point Venture (as heretofore or hereafter platted, from time to time) shall have been sold by the Developer, then the Developer shall cause a Statement of such circumstances to be placed of record in the Deed Records of Travis County, Texas. Thereupon, the lot owners in Point Venture may by vote, as hereinafter provided, elect a committee of five (5) members to be known as the Point Venture Architectural Control Committee (herein referred to as the "Committee"). Each member of the Committee must be an owner of property in some Section of Point Venture. Each lot owner shall be entitled to one (1) vote for each whole lot or building site owned by that owner. In the case of any building site composed of more than one (1) whole lot, such building site owner shall be entitled to one (1) vote for each whole lot contained within such building site.

The Developer shall be obligated to arrange for the holding of such election within sixty (60) days following the filing of the aforesaid Statement by the Developer in the Deed Records of Travis County, Texas, and give notice of the time and place of such election (which shall be in Travis County, Texas) not less than five (5) days prior to the holding thereof. Nothing herein shall be interpreted to require that the Developer actually file any such Statement so long as it has not subdivided and sold the entirety of the property, nor to affect the time at which the Developer might take such action if, in fact, the Developer does take such action.

The results of each such election shall promptly be determined on the basis of the majority of those owners then voting in such election.

After the first such election shall have been held, thereafter the Committee shall be obligated to arrange for elections (in the manner and after notice as set forth above) for the removal and/or replacement of Committee members when so requested in writing by thirty (30) or more lot owners in the Subdivision. Members of the Committee may, at any time, be relieved of their position and substitute members therefor designated by vote as set forth above.

Upon the death, resignation, refusal or inability of any member of the Committee to serve, the remaining members of the Committee shall fill the vacancy by appointment, pending an election as hereinabove provided for.

Effect of
Inaction

3. Approval or disapproval as to architectural control matters as set forth in the preceding provisions shall be in writing. In the event that the authority exercising the prerogative of approval

-4-

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **MAR 0 7 2017**

Dana DeBeauvoir, County Clerk

By Deputy

A. MORALES

1291 1455

or disapproval (whether the Developer or the Committee) fails to approve or disapprove in writing any plans and specifications and plat submitted to it in thirty (30) days following such submission, such plans and specifications and plat shall be deemed approved and the construction of any such building and other improvements may be commenced and proceeded with in compliance with all such plans and specifications and plat and all of the other terms and provisions hereof.

**Effect of**
**Approval**

4.  The granting of the aforesaid approval shall constitute only an expression of opinion, whether by the Developer or the Committee, that the terms and provisions hereof shall be complied with if the building and/or other improvements are erected in accordance with said plans and specifications and plat; and such approval shall not constitute any nature of waiver or estoppel either as to the persons expressing such approvals or any other person in the event that such building and/or improvements are not constructed in accordance with such plans and specifications and plat. Further, no person exercising any prerogative of approval or disapproval shall incur any liability by reason of the good faith exercise thereof. Exercise of any such prerogative by one (1) or more members of the Committee in their capacity as such shall not constitute action by the Developer after the election of such Committee members, notwithstanding that any such Committee member may be a Director of the Developer.

### III.

### DESIGNATION OF TYPES OF LOTS

1.  All lots in the Subdivision as shown on the recorded plat as Lots 463 thru 553, inclusive, are hereby designated as "View Lots".

2.  All lots in the Subdivision as shown on the recorded plat as Lots 554 thru 570, inclusive, are hereby designated as "Cluster Cottage Lots".

3.  The "General Restrictions" set forth in IV. below shall be applicable to all types of lots in the Subdivision hereinabove enumerated and designated. The "Special Restrictions" set forth in V. below shall, in addition to the General Restrictions, apply to the particular type of lots in the Subdivision so indicated.

### IV.

### GENERAL RESTRICTIONS

1.  None of the lots or the improvements thereon shall be used for anything other than single-family, private residential purposes. After the construction of such residences, it is understood that there may also be constructed a garage, servants' quarters and/or guest's quarters, so long as the same are connected (by covered breezeway or otherwise) with, and used in conjunction with such single-family, private residence. For purposes of this instrument, the word "lot" shall not be deemed to include any portion of the following areas shown on the recorded plat: the golf course, any esplanade, the club area, and any unrestricted or reserve areas shown on the plat.

2.  The living area of the main residential structure (exclusive of porches, whether open or screened, garage or other car parking facility, terraces, driveways and servants' quarters) shall be not less than the following respective amounts for each of the designated particular types of lots:

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017
Dana DeBeauvoir, County Clerk
By Deputy: A. MORALES

View Lots:  1,200 sq. ft. for a one-story building;
1,500 sq. ft. for a two-story building; and

Cluster Cottage Lots:  800 sq. ft.

3.a. No building shall be located on any lot nearer to the front street line or nearer to the street side line than the minimum building set-back lines shown on the aforesaid plat (designated thereon as "Bldg. line"). Subject to the provisions of Paragraph 4., no building shall be located nearer than seven and one-half (7-1/2) feet to an interior side lot line. For the purpose of this covenant, eaves, steps and unroofed terraces shall not be considered as part of a building, provided, however, that this shall not be construed to permit any portion of the construction on a lot to encroach upon another lot. Variations from these requirements as to building location may be granted by the Architectural Control Authority if the above requirements are not feasible, considering the terrain of the lot.

b. No structure shall be placed on any lot which (by reason of high walls or fences, excessive height, specially peaked roof design, etc.) unreasonably will obscure the view of Lake Travis from a dwelling located or reasonably to be located upon an abutting lot (and, for this purpose "abutting lot" includes a lot separated only by a street). The decision of the Architectural Control Authority in this matter shall be final.

4.a. Any owner of one or more adjoining lots (or portions thereof) may consolidate such lots or portions into one building site, with the privilege of placing or constructing improvements on such resulting site, in which case side set-back lines shall be measured from the resulting side property lines rather than from the lot lines as indicated on the recorded plat. Any such composite building site must have a frontage at the building set-back line of not less than the minimum frontage of lots in the same block. Any such composite building site (or building site resulting from the remainder of one or more lots having been consolidated into a composite building site) must be of not less than nine thousand (9,000) square feet in area (Cluster Cottage Lots excepted – See Special Restrictions V.) and this shall supersede any contrary provision in the Subdivision plat. Any modification of a building site (changing such building site from either a single lot building site or from a multiple whole lot building site), whether as to size or configuration, may be made only with the prior written approval of the Developer until the Committee is selected and thereafter, only with the prior written approval of the Committee. Upon any such required approval having been obtained, such composite building site shall thereupon be regarded as a "lot" for all purposes hereunder, however, that for purposes of voting for the Committee (as provided under Paragraph II. 2.b. above), an owner shall be entitled to one (1) vote for each whole lot within such owner's building site.

b. Cluster Cottage Lots may have buildings nearer than seven and one-half (7-1/2) feet to an interior side lot line, subject to prior written approval of the Developer until the Committee is selected and thereafter, only with the prior written approval of the Committee. (See Special Restrictions V)

5. All lots in the Subdivision shall be used only for single-family residential purposes. No noxious or offensive activity of any sort shall be permitted, nor shall anything be done on any lot which may be or become an annoyance or nuisance to the neighborhood. No lot in the Subdivision shall be used for any commercial, business or professional purpose nor for church purposes. The renting or leasing of any improvements thereon or portion thereof, without the prior written consent of Developer, is prohibited. No house trailer, camper trailer, camper vehicle or motor vehicle (or portion thereof) shall be lived in on any lot.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017

Dana DeBeauvoir, County Clerk
By Deputy A. MORALES

1291  1457

6.    No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding shall be used on any lot at any time as a residence, except, however, that a garage may contain living quarters for bona fide servants and except also that a field office, as hereinafter provided may be established.

Until the Developer has sold all other lots in Point Venture (and during the progress of construction of residences in the Subdivision), a temporary field office for sales and related purposes may be located and maintained by the Developer (and/or its sales agents). The location of such field office may be changed, from time to time, as lots are sold. The Developer's right to maintain such field office (or permit such field office to be maintained) shall cease when all lots in Point Venture, except the lot upon which such field office is located, have been sold.

7.    No animals, livestock or poultry of any kind shall be raised, bred or kept on any lot, except that dogs, cats or other common household pets may be kept as household pets provided they are not kept, bred or maintained for commercial purposes and provided they do not constitute a nuisance and do not, in the sole judgment of the Developer constitute a danger or potential or actual disruption of other lot owners, their families or guests.

8.    Where a wall, fence, planter or hedge is not specifically prohibited under the Special Restrictions set forth in V. below, the following (as to any permitted wall, fence, planter or hedge) shall apply:  No wall, fence, planter or hedge in excess of two (2) feet high shall be erected or maintained nearer to the front lot line than the front building set-back line, nor on corner lots nearer to the side lot line than the building set-back line parallel to the side street.  No rear fence, wall or hedge and no side fence, wall or hedge located between the side building line and the interior lot line (or located on the interior lot line) shall be more than six (6) feet high. (Cluster Cottage Lots excepted – see Special Restrictions V)

No object or thing which obstructs sight lines at elevations between two (2) and six (6) feet above the roadways within the triangular area formed by intersecting street property lines and a line connecting them at points twenty-five (25) feet from the intersection of the street lines (or extensions thereof) shall be placed, planted or permitted to remain on corner lots.

9.    The drying of clothes in public view is prohibited, and the owners or occupants of any lots at the intersection of streets or adjacent to parks, playgrounds or other facilities where the rear yard or portion of the lot is visible to the public, shall construct and maintain a drying yard or other suitable enclosure to screen drying clothes from public view.

10.   All lots shall be kept at all times in a sanitary, healthful and attractive condition, and the owner or occupants of all lots shall keep all weeds and grass thereon cut and shall in no event use any lot for storage of material or equipment except for normal residential requirements or incident to construction of improvements thereon as herein permitted, or permit the accumulation of garbage, trash or rubbish of any kind thereon.  Any incinerator or other equipment for the storage or disposal of such material shall be kept in a clean, sanitary and sightly condition.  During the construction of improvements no trash shall be burned on any

-7-

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017

Dana DeBeauvoir, County Clerk

By Deputy A. MORALES

lot except in a safe manner, and, unless so burned, shall be removed by the lot owner. Boats, trailers and other parked vehicles are to be stored in a location no closer to the street than the front building set-back line, or in the case of a corner lot the side building line facing the street.

In the event of default on the part of the owner or occupant of any lot in observing the above requirements or any of them, such default continuing after ten (10) days written notice thereof, the Developer (until the Committee is selected, and thereafter, the Committee) may, without liability to the owner or occupant in trespass or otherwise, enter upon (or authorize one or more others to enter upon) said lot, and cuase to be cut, such weeds and grass, and remove or cause to be removed such garbage, trash and rubbish or do any other thing necessary to secure compliance with these restrictions, so as to place said lot in a neat, attractive, healthful and sanitary condition, and may charge the owner or occupant of such lot for the reasonable cost of such work and associated materials. The owner or occupant, as the case may be, agrees by purchase or occupation of the property to pay such statement immediately upon receipt thereof; however, the payment of such charge is not secured by any nature of lien on the property.

11. Before initial residencial occupancy, no sign, advertisement, billboard or advertising structure of any kind may be erected or maintained on any lot in the Subdivision without the prior approval of the Developer; and any such approval which is granted by the Developer may be withdrawn at any time by the Developer, in which event, the party granted such permission shall, within the period designated by the Developer (which in no event shall be less than five (5) days), thereupon remove same. After initial residential occupancy of improvements on any particular lot in the Subdivision, no sign, advertisement, billboard or advertising structure of any kind other than a normal for-sale sign approved by the Developer as to design, not exceeding two feet by three feet (2' x 3') erected on a post in the ground, and applicable to such lot alone, may be erected or maintained on such lot.

The Developer until the Committee is selected, and thereafter the Committee, shall have the right to remove and dispose of any such prohibited sign, advertisement, billboard, or advertising structure which is placed on any lot, and in so doing shall not be subject to any liability for trespass or other tort in connection therewith or arising from such removal nor in any way be liable for any accounting or other claim by reason of the disposition thereof.

12. The digging of dirt or the removal of any dirt from any lot is expressly prohibited except as necessary in conjunction with the landscaping of or construction on such lot.

13. No lot or other portion of Point Venture shall be used or permitted for hunting or for the discharge of any pistol, rifle, shotgun, or any other firearm, or any bow and arrow or any other device capable of killing or injuring.

14. No outside toilets will be permitted, and no installation of any type of device for disposal of sewage shall be allowed which would result in raw or untreated or unsanitary sewage being carried into any water body. No septic tank or other means of sewage disposal may be installed unless approved by the proper governmental authorities having jurisdiction with respect thereto and the Developer.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017

Dana DeBeauvoir County Clerk

By Deputy: A MORALES

-8-

15. No oil drilling, oil development operations, oil refining, or mining operations of any kind shall be permitted upon any lot, nor shall any wells, tanks, tunnels, mineral excavations or shafts be permitted upon any lot. No derrick or other structure designed for use in boring for oil or natural gas, shall be erected, maintained or permitted on any building site. At no time shall the drilling, usage or operation of any water well be permitted on any lot.

16. Drainage structures under private driveways shall always have a net drainage opening area of sufficient size to permit the free flow of water without backwater.

17. All property owners, members of their families and their guests, shall have the right of ingress and egress to the lake through the park areas as shown on the Point Venture Section Two Subdivision plat. Such right shall extend to and include the owners of lots within Section Three-1 of the Point Venture Subdivision as well as subsequent sections developed by the Developer from lands contiguous to or in the vicinity of the said Point Venture Subdivision. All parks and improvements shall be available for use by such property owners, their families and guests, at their own risk. When 75 % of the lots in all sections of Point Venture Subdivision have been sold, or sooner at the election of the Developer, Developer may transfer title to all parks and other community areas to the Venture Yacht and Country Club or other civic organization active in the area, after which the operation of and maintenance and payment of taxes on such parks and other community areas shall be the responsibility of such transferee.

18. The Developers or any person, firm or corporation operating the golf course in the Subdivision shall not be held liable for any damages to any lot owner, their guests, or their heirs, administrators or assigns resulting from operation of said golf course.

19. The property included in the Subdivision is subject to all easements of record, and especially to include those certain easements in favor of Lower Colorado River Authority of record in Vol. 587, page 440, Vol. 601, page 536, Vol. 676, page 428, and Vol. 678, page 127 of the Travis County Deed Records, to which easements and their record thereof reference is hereby made for all purposes. The property is also subject to that certain Oil and Gas Lease, dated January 6, 1967, as recorded in Volume 3245, page 1722, Deed Records of Travis County, Texas.

20. Where underground utility services shall be available for said lots, no above surface utility wires will be installed outside of any structure. Underground utility service lines shall extend through and under said lots in order to serve any structure thereon, and the area above said underground lines and extending 2-1/2 feet to each side of said underground line shall be subject to excavation, refilling and ingress and egress for the installation, inspection, repair, replacing and removing of said underground facilities by such utility company; and owners of said lots shall ascertain the location of said lines and keep the area over the route of said lines free of excavation and clear of structures, trees or other obstructions.

V.

SPECIAL RESTRICTIONS

1. In addition to the General Restrictions set forth in IV. above, the following restrictions shall apply:

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017

Dana DeBeauvoir, County Clerk

By Deputy A. MORALES

-9-

1291 1460

a. No pier, dock, or other structure shall be permitted without prior approval of the Architectural Control Authority as set forth in II. above.

b. Any garage must be attached to the main residence and must be not nearer to the lake shore than the main residence itself.

2. In addition to the General Restrictions set forth in IV.above, the following restrictions shall apply to Cluster Cottage Lots:

a. No wall, fence, planter hedge (or other improvements or object serving a like or similar purpose) shall be constructed or permitted without the written consent of the Developer.

b. Each person acquiring a Cluster Cottage lot must be a member of Point Venture, Inc., and must remain a member in good standing as long as they own property in the Cluster Cottage Lot section.

c. Since zero lot line and/or common wall concepts are anticipated, the Developer, until the Committee is selected and thereafter the Committee, shall be the sole and prevailing authority regarding wall, fence and building set-back requirements. Such authority shall at all times be consistant and in the best interest for all parties concerned in the Cluster Cottage Area.

## VI.

### VENTURE YACHT AND COUNTRY CLUB MEMBERSHIP

Each person acquiring property in the Subdivision (whether acquiring same initially or upon resale) must first apply and be accepted for membership in the Venture Yacht and Country Club, and must remain a member in good standing as long as they own property in the Subdivision.

## VII.

### VENTURE YACHT AND COUNTRY CLUB FUND

1. Each lot (or residential building site) in the Subdivision shall be and is hereby made subject to an annual Venture Yacht and Country Club charge (hereafter referred to as the "Club Fund"), except as otherwise hereinafter provided.

2. The Venture Yacht and Country Club Fund referred to shall be used to create a fund to be known as the "Club Fund"; and each such "Club Fund" charge shall (except as otherwise hereinafter provided) be paid by the owner of each lot (or residential building site) annually, in advance, on or before September 1st of each year, beginning 1972.

3. The exact amount of each Club Fund charge will be determined by the Developer during the month preceding the due date of said Club Fund. All other matters relating to the assessment, collection, expenditure and administration of the Club Fund shall be determined by the Developer.

4. The Club Fund charge shall not, without the consent of the Developer, apply to lots owned by the Developer or owned by any person, firm, association or corporation engaged primarily in the building and construction business which has acquired title to any such lots for the sole purpose of constructing improvements thereon and thereafter selling such lots; however, upon any such sale of such lots by such person, firm, association or corporation to a purchaser whose primary purpose is to occupy and/or rent and/or lease such lot (and improvements thereon, if any) to some other occupant, then the Club Fund charge shall thereupon be applicable to such lot; and the Developer hereby consents to the applicability of the Club Fund charge to each such lot under the circumstances herein stated. Any transfer of title to any lot by any such person, firm, association or corporation engaged primarily in the building and construction business to a tranferee engaged primarily in the building and construction business shall not result in the applicability of the Club Fund charge to such lot owned by the transferee or any succeeding transferee primarily engaged in

-10-

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017 Dana DeBeauvoir County Clerk By Deputy A MORALES

12911 1461

the building and construction business without the consent of the Developer. The Developer reserves the right at all times, in his own judgment and discretion, to exempt any lot in the Subdivision from the Club Fund charge, and exercise of such judgment and discretion when made in good faith shall be binding and conclusive on all persons and interests. The Developer shall have the further right at any time, and from time to time, to adjust, alter or waive said Club Fund charge from year to year as it deems proper; and Developer shall have the right at any time to discontinue or abandon such Club Fund Charge, without incurring liability to any person whomscever by filing a written instrument in the office of the County Clerk of Travis County, Texas, declaring such discontinuance or abandonment.

5. The Club Fund charges collected shall be paid into the Venture Yacht and Country Club Fund to be held and used for the benefit, directly or indirectly, of the Subdivision; and such Club Fund may be expended by the Developer for any purposes which, in the judgment of the Developer will tend to maintain the property values in the Subdivision, including by way of example but not by way of limitation: providing for the enforcement of the provisions of this instrument, including the aforesaid Reservations, Restrictions and Covenants; for the maintenance, operation, repair, benefit and welfare of any recreational and/or utility facilities which might hereafter be established in Point Venture; and generally for doing any other thing necessary or desirable in the opinion of the Developer to maintain or improve the property of the Subdivision. The use of the Club Fund for any of these purposes is permissive and not mandatory, and the decision of the Developer with respect thereto shall be final, so long as made in good faith.

6. In order to secure the payment of the Club Fund charge hereby levied, a vendor's lien shall be and is hereby reserved in the Deed from the Developer to the purchaser of each lot or portion thereof, which lien shall be enforceable through appropriate judicial proceedings by the Developer. Said lien shall be deemed subordinate to the lien or liens of any bona fide lender which hereafter lends money for the purchase of any property in the Subdivision, and/or for construction (including improvement) and/or permanent financing of improvements on any such property.

7. These provisions as to the Club Fund charge and the Venture Yacht and Country Club Fund shall continue in effect unless changed in the manner and at the time or times hereinabove provided for effecting changes in the restrictive covenants hereinabove set forth.

VIII.

TRANSFER OF FUNCTIONS OF THE DEVELOPER

The Developer may at any time hereafter cause one or more non-profit corporations to be organized under the laws of the State of Texas for the purpose of exercising all or any of the duties and prerogatives of the Developer hereunder (including the matters relating to "Club Fund" charges and the Venture Yacht and Country Club Fund). Any such delegation of authority and duties shall serve to automatically release the Developer from further liability with respect thereto and vest such duties and prerogatives in such non-profit corporations. Any such delegations shall be evidenced by an instrument amending this instrument, placed of record in the Deed Records of Travis County, Texas, and joined by the Developer and the aforesaid non-profit corporations but not, however, requiring the joinder of any other person in order to be fully binding, whether

-11-

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on ,

Dana DeBeauvoir, County Clerk

MAR 0 7 2017

By Deputy A. MORALES

1291 1402

such other person be an owner of property in the Subdivision, a lienholder, mortgagee Deed of Trust beneficiary or any other person.

## IX.

## AMENDMENTS

Any or all of the covenants herein may be annulled, amended or modified at any time at the recommendation of the Architectural Control Authority, or its successors, and ratified by a vote of two-thirds of the lot owners in the Subdivision. All such lot owners shall be given thirty (30) days notice in writing of any proposed amendment before same is adopted. There shall be no annullment, amendment or modification of these covenants without the prior recommendation of the Architectural Control Authority.

## X.

## BINDING EFFECT

All of the provisions hereof shall oe covenants running with the land thereby affected. The provisions hereof shall be binding upon and inure to the benefit of the owners of the land affected and the Developer and their respective heirs, executors, administrators, successors and assigns.

## XI.

## CAPTIONS

The captions inserted at the beginning of any paragraph of these Restrictions are intended for convenience of reference only and shall not be deemed to constitute a part of these Restrictions nor be used in the construction or interpretation of this instrument nor shall such captions be deemed indicative of the intent of any party hereto.

WITNESS my hand at Houston, Texas, on this the _15th_ day of _March_, 1972.

VENTURE DEVELOPMENT COMPANY
A Partnership

By Smith Land Company, Inc.,
Partner, Agent and Attorney-in-Fact

ATTEST:

By _____
Vice President

_____
Assistant Secretary

-12-

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 20

Dana DeBeauvoir, County Clerk
By Deputy: A. MORALES

1291 1463

56-7405

THE STATE OF TEXAS       §

COUNTY OF _Harris_  §

      BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared _Joel M Cummings_ , Vice President of SMITH LAND COMPANY, INC.,said Corporation being a partner in and agent and attorney-in-fact for Venture Development Company, a partnership, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of said Smith Land Company, Inc., a Texas corporation, and that he executed the same as the act and deed of such Corporation as a partner in and agent and attorney-in-fact for Venture Development Company, for the purposes and consideration therein expressed and in the capacities therein stated.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _15th_ day of _March_ , 1972.

"NOTARY SEAL"

_Hazel W. Klanke_
Notary Public in and for
_Harris_ County, Texas.

FILED
MAR 27 10 45 AM '72
COUNTY CLERK
TRAVIS COUNTY, TEXAS

STATE OF TEXAS                    COUNTY OF TRAVIS
   I hereby certify that this Instrument was FILED on the date and at the time stamped hereon by me; and was duly RECORDED, in the Volume and Page of the named RECORDS of Travis County, Texas, as Stamped hereon by me, on

MAR 27 1972



COUNTY CLERK
TRAVIS COUNTY, TEXAS

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on MAR 0 7 2017
Dana DeBeauvoir County Clerk
By Deputy A. MORALES

-13-

1291  1464

# AMENDMENT TO RESTRICTIONS

STATE OF TEXAS        §
                           §

COUNTY OF TRAVIS    §

## ARTICLE I. RECITALS

The undersigned owners hereby amend those certain restrictions recorded in Volume 4291, Page 1452, Deed Records of Travis County, Texas, concerning Point Venture, Section Three-1, according to the plat of said subdivision recorded in Volume 58, Page 48, Plat Records, Travis County, Texas ("Subject Property").

## ARTICLE II. AMENDMENT

No property shall be rented except under a written lease for a term of not less than ninety (90) days. The purpose of this amendment is to prohibit short term rentals. Any lease that attempts to circumvent this prohibition by offering early cancellation, early termination without penalty, or any other scheme to violate the intent of this prohibition will be deemed to be a violation of this restriction.

## ARTICLE III. GENERAL

3.1 **Enforcement; Obligations Run with the Land.** The restriction adopted and established for the Subject Property by this Restriction is imposed upon and made applicable to the Subject Property and shall run with the Subject Property and shall (i) be binding upon and inure to the benefit of and be enforceable by any owner, and each purchaser and grantee of the Subject Property or any portion thereof, and the respective heirs, legal representatives, successors and assigns of any owner and (ii) inure to the benefit of and be enforceable by any owner of property in this subdivision, and the respective heirs, legal representatives, successors and assigns of any such owner.

3.2. **Strict Compliance.** Each owner of the Subject Property, or any portion thereof, shall strictly comply with the purpose of this Restriction. Failure to strictly comply with this Restriction shall be grounds for an action to recover sums due for damages, injunctive relief, or both, including reasonable attorney fees, maintainable by any owner and the respective heirs, legal representatives, successors and assigns of each owner.

3.3. **Amendment.** This restriction may not be amended, altered, repealed, terminated or modified in any way unless and until (i) the approval of owners of sixty-seven (67%) of the Subject Property is obtained ,each as evidenced by a written instrument executed by such owners and filed in the Real Property Records of Travis County, Texas.

3.4 **Gender and Number.** The singular wherever used herein shall be construed to mean the plural where applicable, the pronouns of any gender shall include the other genders, and the necessary grammatical changes required to make the provisions hereof applicable to individuals, corporations, trusts, partnerships, or other entities shall in all cases be assumed as though in each case fully expressed.



PLAINTIFF'S EXHIBIT

3

-1-

3.5     **Interpretation.** If this Restriction or any word, clause, sentence, paragraph or other part thereof shall be susceptible to more than one or conflicting interpretations, then the interpretation which is most nearly in accord with the general purposes and objectives of this Restriction shall govern.

3.6     **Omissions.** If any punctuation, word, clause, sentence or provision necessary to give meaning, validity or effect to any other word, clause, sentence or provision appearing in this Restriction shall be omitted herefrom, then it is hereby declared that such omission was unintentional and that the omitted punctuation, word, clause, sentence or provision shall be supplied by inference.

3.7     **Incorporation of Recital and Introductory Paragraph.** The Recitals and introductory paragraph of these Restrictions are hereby fully incorporated into, and a part of, these Restrictions for all purposes.

*[Remainder of this page intentionally blank. Execution on following page.]*

IN WITNESS WHEREOF, the undersigned owners have executed this document to be effective as of March 15, 2017 (the "*Effective Date*").

Lot \_\_\_\_

_____

_____

STATE OF TEXAS
COUNTY OF _____

This instrument was acknowledged before me on _____, 201\_\_\_, by

_____.

_____
NOTARY PUBLIC, STATE OF TEXAS

*Kathy is a Member of the "Point Venture Renters Association". As are other STR owners in Sec 3-1.*

*They obviously were aware of Amendment by 2/3/17!*

## # of Lots    Notification

53 Initial Mailing to Out of Town lot owners Jan 12-16th

45 Initial Mailing to local lot owners Jan 27

3 Hand delivered documents to local owners

## No direct mailing was sent to the following

4 Owners of STRs in Sec 3-1

1 Owner of STR 1 mile from PV, owns lot in Section 3-1

2 STR sympathizers/supporters

Probst-was a financial advisor to Lisa Jackson in husband's absence

Aird - realtor providing support to Richard & Lisa Jackson

## 108 Lots in Section 3-1

### ▇▇ Benchmarking & Metrics

*Didn't Send Mail out to STR & Friends because of History of Harassment we have endured & Didn't want to waste a Stamp*



PLAINTIFF'S EXHIBIT
4

≡

< Back to search results

VRBO Listing #3948392ha

Home ▸ Point Venture, TX, USA

---

View more of the HomeAway Family

---

List your property | Testimonials | Advantages | Rental Guarantee | Links | Luxury from HomeAway | Careers | Product News

Insider Guides provided by

©Copyright 1995-Present HomeAway.com, Inc. All rights reserved. Use of this website constitutes acceptance of the Terms and Conditions and Privacy Policy. "VRBO" and "Vacation Rentals by Owner" are registered trademarks of HomeAway.com, Inc. and cannot be used without permission.





Guests (required)

**Minimum stay** 2-4 nights

Request to Book

Send email

⊙ Booking confirmation within 24 hours

Get an Instant Quote

**Pay with confidence**

When you book through the VRBO website, your booking is backed by our Book with Confidence Guarantee
Learn more

Save to my favorites

⊠ Report this listing

| | |
|---|---|
| **Minimum stay:** | 2-4 nights |
| **Sleeps:** | 16 |
| **Bedrooms:** | 5 |
| **Bathrooms:** | 3 |
| **Property type:** | House |
| **Internet:** | Yes |
| **Pets considered:** | Ask Owner |
| **Wheel chair accessible:** | Yes |

## About the Property

**5 bedroom, 3 bath Lake View Home with 1700 sq. ft. deck on Scenic Lake Travis**

***LARGE 5 BEDROOM HOME WITH 3 FULL BATHROOMS***
***Hot Tub and Outside Fireplace***
***NO house PARTIES or EVENTS allowed***



DEFENDANT'S EXHIBIT

PENGAD-Bayonne, N. J.

Feedback

1700 SQUARE FOOT DECK with water wall feature and HOT TUB has panoramic views of Lake Travis. Guests gather on the deck for lively conversation and to toast the sun as it sets over the lake and extending hill country.

Evenings are enjoyed down by the OUTSIDE FIREPLACE and patio where a fire welcomes s'mores and more.

The large sectional sofa in the MOVIE ROOM provides a great movie going experience watching the 65" TV screen. The movie room is a 6th bedroom that sleeps at least two on the trundle bed.

The master bedroom has an in-suite LARGE MASTER BATHROOM with a separate shower and Jacuzzi bathtub. The master bedroom also has a balcony that faces the lake which gives the feeling of being high in the trees like a tree house.

Upstairs is an APARTMENT set up with an additional entrance from the deck. The apartment includes 2 bedrooms, 1 bath, living room, dining room and a kitchen that has a full size refrigerator, microwave and sink. The double doors that lead to the deck from the apartment showcase stunning views of Lake Travis.

More details



### Owner
Member since: 2015

Send email

Speaks: **English, Spanish**
Response time: **Within an hour**
Response Rate: **100%**
Calendar last updated: **03/06/2017**

---

### Property Type
House       3200 sq. ft.

---

### Accommodation Type
Vacation Rental

---

### Meals
Guests Provide
Their Own Meals

---

### Suitability

Long-Term Renters Welcome

Minimum Age Limit For Renters:
*25 years old.*

Children Welcome:
*Great park area with a beach, children's…more*

Non Smoking Only

Wheelchair Accessible:
*2 Bedrooms and 1 bathroom are lo…more*

---

**Bedrooms:** 5 Bedrooms, Sleeps 16, Beds for 16

Master Bedroom: 1 king
*Balcony with view of Lake Travis.*

Hot Tub Bedroom: 1 queen
*Private door to hot tub and deck.*

Guest Bedroom: 2 double
*Large bedroom on the first floor.*

Feedback

Apartment Bedroom 1: 1 queen
*Private bedroom in attached apartment.*

Apartment Bedroom 2: 1 queen
*Private bedroom with view of Lake Travis*

5/6 Bedroom house - 2 bedrooms on the first floor. 3 bedrooms upstairs. Trundle bed that sleeps 2 located in the 6th bedroom/movie room. Futon in the loft sleeps 2.

**Bathrooms:** 3 Bathrooms

Master Bathroom: toilet, shower, jetted tub
*Large bathroom with private toilet room. 2 sinks. Big closet*

Downstairs Bathroom: toilet, combination tub/shower
*First floor full bathroom.*

Apartment Bathroom: toilet, combination tub/shower
*Full bathroom upstairs in the apartment.*

1 bathroom on the first floor. 2 bathrooms upstairs including the master bathroom. 3 Full bathrooms with plenty of hot water. Jacuzzi bathtub in master. Separate walk-in shower.

## Other Amenities

Restaurant floating out on Lake Travis is located right within Point Venture. Go down at the end of the day for dinner and to listen to the locals play music.

## Entertainment

| | | |
|---|---|---|
| DVD Player | Games: | Television: |
| Game Room: | *Board games, checkers, monopoly, operation.* | *42 " Panasonic Plasma Flat Screen in liv...more* |
| *Stargate Arcade game with 6 games including* | Satellite / Cable | Video Games: |
| | | *Stargate Arcade game with 6 games including* |
| | | Video Library: |
| | | *DVDs* |

## Theme

| | | |
|---|---|---|
| Adventure | Family | Sports & Activities |
| Away From It All | Romantic | |

## Attractions

| | | |
|---|---|---|
| Caves | Marina | Restaurants |
| Festivals | Playground | Winery Tours |
| Library | Recreation Center | |

## Local Services & Businesses

| | | |
|---|---|---|
| ATM/Bank | Fitness Center | Groceries |

## Leisure Activities

| | | |
|---|---|---|
| Bird Watching | Scenic Drives | Walking |
| Photography | Sight Seeing | |

## Location Type

Feedback

| Lake View: | Village: | Water View: |
|---|---|---|
| *1700 square foot deck has a panoramic ...more* | *Village of Point Venture. Population* | *View of Lake Travis.* |

## Sports & Adventure Activities

| Basketball Court | Hiking | Sailing |
|---|---|---|
| Cycling | Jet Skiing | Swimming |
| Fishing | Mountain Biking | Tennis |
| Fly Fishing | Pier Fishing | Water Skiing |
| Golf | Rafting | Water Tubing |
| Golf Privileges Optional | Roller Blading | Wind-Surfing |

## Dining

| Dining: | Dining Area | Seating for 8 people |
|---|---|---|
| *Large dining table. Great for family* | | |

## General

| Air Conditioning | Hair Dryer | Linens Provided |
|---|---|---|
| Clothes Dryer: | Heating | Living Room |
| *Nice high end front loading machine.* | Internet: | Parking: |
| Fireplace: | *Wi-Fi code provided.* | *6 cars max in driveway.* |
| *Outdoor fireplace for great gatherings.* | Iron & Board | Towels Provided |
| Fitness Room / Equipment: | | Washing Machine: |
| *Point Venture Club House.* | | *Nice high end front loading machine.* |

## Kitchen

| Coffee Maker | Kitchen: | Refrigerator: |
|---|---|---|
| Dishes & Utensils: | *Main kitchen has large island that ...more* | *Ice maker and in door water dispenser.* |
| *Plates, silverware and glasses for 18 people.* | Microwave | Stove: |
| Dishwasher | Oven: | *5 burner electric stove.* |
| | *Electric* | Toaster |

## Outside

| Balcony: | Golf: | Outdoor Grill: |
|---|---|---|
| *Master bedroom balcony and apa ...more* | *Great 9 hole golf course right in Point* | *Charcoal Grill* |
| Boat: | Lanai / Gazebo: | Tennis: |
| *Boat Rentals at Lago Vista - Lake Tra\...more* | *Outdoor sitting area under the gazebo on* | *Community tennis courts. Bring yo\...more* |
| Deck / Patio: | Lawn / Garden: | |
| *Large 1700 square foot deck with fabulo ...more* | *Secret Garden. Beautiful doors I ...more* | |

## Pool / Spa

| Communal Pool: | Hot Tub: |
|---|---|
| *Junior Olympic size swimming pool with* | *Private hot tub on the deck that* |

Feedback

# Reviews

**4.9** ★★★★★ from
**40 traveler reviews**

Write a review




RALPHAELL
W.
Houston

## Carl's on the Lake
★★★★★

The house was spacious and clean. Lots of
amenities. Allowed my family to entertain and to
rest comfortably.

**Stayed:** January 2017    **Submitted:** January 17, 2017
**Source:** VRBO

**Owner response:**
So glad your family had a wonderful time
gathering for the send off to the Peace Corp.

Was this review helpful?  **0**  Yes    **0**  No




Shannon F.

## Exceeded all our expectations!!
★★★★★

Even 14• temps couldn't keep these girls off this
amazing deck. If you are looking for a place to get
away with a group where there is also plenty of
space to be alone if necessary, this home is for you.
It was a great "homebase" for our trip, and we WILL
be back.

**Stayed:** January 2017    **Submitted:** January 11, 2017
**Source:** VRBO

**Owner response:**
It was such joy to see you girls exploring and
enjoying the hill country even in frigid
temperatures. Looking forward to when you
are back with us again!

Was this review helpful?  **0**  Yes    **0**  No



Lynae P.

## Excellent floor plan for a large group, including children
★★★★★

Our family just had an amazing reunion for my
parent's 40th wedding anniversary - 10 adults and a
bunch of grandkids. There was plenty of space for
everyone to have a bed - and several bedrooms
away from the general living area that were great
for naps and late sleepers! The deck and hottub area
were immaculate and there was so much outdoor
seating. We enjoyed the fire pit and the kids loved
exploring the secret garden. The kids also loved

Feedback

taking some trips to the park nearby to run around and get some energy out! And the media room with the giant TV was a good distraction at times as well!

The kitchen was well stocked with dishes for cooking and baking, with plenty of plates and silverware for all! All of the appliances were clean and well-functioning - made meals for a large group smooth and easy!

The home was immaculately clean and fresh - it smelled amazing and was decorated in a cozy, Texas hill country style. The furniture was comfortable and very clean with plenty of seats. The open floor plan made it easy to hang out as a group while some were preparing meals or cleaning up. Plenty of fluffy towels and linens. Great little soaps and shampoos and other amenities to get you through the first couple days. Pillows and beds were very comfortable and made for a great night's sleep!

Lisa was incredibly responsive and helped with any questions within just a minute or two. Always very gracious and responded as if she were helping a friend and not a stranger! You could feel the love that they had for their home in how well it was taken care of. So hospitable and such a special place to share time as a family!

Highly recommend this lovely home! You will be so glad you came to visit! Hope we get to make it back in the summer to enjoy the lake sometime soon!

**Stayed:** December 2016
**Submitted:** January 4, 2017       **Source:** VRBO

**Owner response:**
It was a great gathering and we look forward to having the family back again this summer! We agree that our home is spacious and inviting and the views from the deck are a favorite! It was a pleasure hosting you in our home.

Was this review helpful?   **0**  Yes    **0**  No

## Wow, what a beautiful view
★★★★★



Nancy G.

Carl's on the Lake was the perfect place for our family get-together. The weather was awesome, so we spent more time outside than in, but the house met all the needs of our 10 adults and five kids. We had plenty of room to sleep, cook, eat and play. The upstairs area plus apartment allowed us to spread out and do whatever we wanted individually. Lisa was very accommodating and made herself available at all times. Her attention to detail was impressive. Would love to stay here again.

**Stayed:** September 2016
**Submitted:** October 3, 2016       **Source:** VRBO

Feedback

**Owner response:**
 We would love to have you back. It's a
wonderful place!

Was this review helpful?   **1**   Yes    **0**   No

---



Nancy P.

## Fun Family Reunion Weekend

★★★★★

Close to 20 of us stayed at Carl's on the Lake for
two nights and had a wonderful time. The home is
beautiful, well equipped and the view is spectacular!
We had a mix of all ages and there was plenty of
room for all of us. The day we arrived someone
wanted to watch a football game on ESPN and found
that the station wasn't available. I called Lisa about
it and within an hour we were up and running with
ESPN on all the TVs. It's very obvious that she cares
about her home and those who vacation there. It
was a nice touch that Lisa left a basket of koozies
and bubbles on the table for us to use. The kids
loved the bubbles on the back deck while the adults
relaxed and soaked in the view. There are a few
rules in the neighborhood, but not anything too
difficult to handle. There is parking for only six cars
at the house and no street parking however there is
a nice parking lot for overflow parking. It was easy
to drop off the cars that were driving in and out over
the weekend and use the circle driveway for parking
for the rest. The private park in Point Venture is
very nice and we enjoyed being able to use it and
also the boat ramp in the park. Bugs at dusk are an
issue on the back deck so I suggest bringing
repellent. There were a few containers of bug
repellent left for us to use, but most were close to
empty. One suggestion for Lisa is that the home
have a recycling bin. If there was one, we never saw
it and it was a shame to put so many cans and
bottles in the regular trash. I would definitely
recommend Carl's on the Lake for families or groups
of friends who are looking for are looking for a fun
and relaxing vacation!

**Stayed:** September 2016
**Submitted:** September 28, 2016     **Source:** VRBO

**Owner response:**
 So glad your college football teams delivered
for you! Bubbles at sunset - nothing more
fun! And yes, we had recycle bins however
they were being used consistently for regular
trash. The park ramps is such a breeze to
launch the boats in the lake for great fun out
on Lake Travis.

Was this review helpful?   **0**   Yes    **0**   No

Feedback



### Couldn't have booked a better house for a long weekend Bachelorette party!

★★★★★

Margot F.

Amazing view, beautiful sunsets. Great community - awesome house. Perfect for a long weekend Bachelorette party! So much fun and many memories created! Can't wait to visit again!

**Stayed:** September 2016
**Submitted:** September 8, 2016
**Source:** HomeAway Family

**Owner response:**
There's always lots of fun to be had and memories made at the lake last a lifetime. So wonderful to have you girls start the memories in Point Venture.

Was this review helpful? **0** Yes **0** No




### Amazing Lake Views!

★★★★★

Jamie D.

This home was everything we could have wanted for a girl's weekend getaway! My favorite part was that the patio was large enough for our group of 16 to enjoy morning coffees and evening sunsets on the patio comfortably. We went down to the beach area one day and enjoyed some fun in the water. The home and community were just perfect! Lisa is extremely communicative and helpful every step of the way.

**Stayed:** August 2016     **Submitted:** September 6, 2016
**Source:** VRBO

**Owner response:**
So glad you enjoyed the time on the deck. Those sunsets can't be beat. And the water is so clear down off the park. It is always a fun day down at the water's edge.

Was this review helpful? **0** Yes **0** No



### Great Get-a-way!

★★★★★

Cherie B.

This house/view is amazing and worth every penny! Would definitely re-book!

**Stayed:** August 2016     **Submitted:** August 25, 2016
**Source:** VRBO

**Owner response:**
Thank you! We think the view is pretty

Feedback

amazing too. Happy to have you come stay again!

Was this review helpful?  **0** Yes  **0** No

---



Brooke C.

## Wonderful House with Great View
★★★★★

We really enjoyed our stay at Carl's by the Lake! It was the perfect house for our large family to gather. The house has plenty of space, everything was clean, the kitchen was well stocked, and the view was amazing. Lisa was great to work with and responded quickly if we needed anything.

**Stayed:** July 2016   **Submitted:** August 11, 2016
**Source:** VRBO

**Owner response:**
It was wonderful to have your family of 14 including those cute children in our community for your family vacation. Loved the "Yellow Jacket" connection. Looking forward to having you back for s'mores again!

Was this review helpful?  **0** Yes  **0** No

---



Tom L.

## Great vacation spot - we absolutely loved it.
★★★★★

We used "Carl's on the Lake" as a point of celebration for my 70th. Birthday. Had family from as far away as Oregon and Michigan, as well as San Antonio and Dallas. Grandkids from the age of 7 months to 20 years, and 6 separate families. The LakeHouse was absolutely perfect in every way. All ages enjoyed it.. We gave it a severe test, and it passed with flying colors... Tom Longhway and Family..

**Stayed:** June 2016   **Submitted:** June 28, 2016
**Source:** HomeAway Family

**Owner response:**
So glad you chose to stay with us for your 70th! Our home is definitely a great place for families with all age groups finding their perfect spot in the house. You left no signs of the testing of the house. Thanks for taking such good care in our community and our home.

Was this review helpful?  **0** Yes  **0** No

Feedback

Show More Reviews

# Rates

Currency Conversion

**Rental basis:** Per property

Rental rates quoted in:    USD ▾

| Dates | Nightly | Weekend Night | Weekly | Monthly * | Event |
|---|---|---|---|---|---|
| **Memorial Day Holiday** May 25 - May 30, 2017 3 night min stay | $995 | | | | |
| **Summer 1** May 31 - Jun 28, 2017 2 night min stay | $895 | $950 Fri, Sat | $4,500 | | |
| **4th of July Holiday** Jun 29 - Jul 5, 2017 3 night min stay | $995 | | $4,500 | | |
| **Summer 2 2017** Jul 6 - Aug 31, 2017 2 night min stay | $895 | $950 Fri, Sat | $4,500 | | |
| **Labor Day Holiday** Sep 1 - Sep 4, 2017 3 night min stay | $995 | | | | |
| **Thanksgiving** Nov 20 - Nov 26, 2017 3 night min stay | $895 | | $4,500 | | |
| **Christmas/New Year's** Dec 22 - Jan 1, 2018 4 night min stay | $895 | | | | |
| **My Standard Rate** 2 night min stay | $795 | $895 Fri, Sat | $3,700 | $9,975 | |

\* Approximate Monthly rates, actual rate will depend on the days of the month you stay

**Additional information about rental rates**

## Fees and Rental Conditions:

| | |
|---|---|
| Cleaning Fee | $200 |
| Refundable Deposit | $300 |
| Property Damage Protection | $79 |
| Pet Fee | $150 |
| Tax Rate | 6% |

Feedback

## Notes:

All pets subject to prior approval. Pet fees are per pet and no more than 2 pets permitted.

Photo ID required with rental agreement. Financially responsible party must be a member of the guest group. All guests must be over age 25 or accompanied by legal guardian.

50% of Rental is due at booking to secure your reservation.

Cancellations within the 30 days of arrival are subject to loss of 100% of payment unless our home can be booked with another guest and then at that time a full refund minus the $50.00 booking charge will be refunded to you.

Refundable deposit is returned in full if house rules are adhered to during the stay.

There is a non-refundable booking charge of $50.00.

## Owner's cancellation policy:

100% refund if canceled at least 30 days before arrival date.

**Don't forget your vacation protection!** Get protected now
Adding our Vacation Protection services can make sure your getaway goes smoothly, no matter what. We offer Cancellation Protection and Damage Protection so you can truly relax.

Protect your payments in case you need to cancel.

Travel with peace of mind.

Ensure you're prepared in case of accidental damage.

# Calendar

**Last updated:** 03/06/2017



| 28 | 29 | 30 | 31 | | | | | 25 | 26 | 27 | 28 | 29 | 30 | |

### July 2017

| SU | MO | TU | WE | TH | FR | SA |
|----|----|----|----|----|----|----|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

### August 2017

| SU | MO | TU | WE | TH | FR | SA |
|----|----|----|----|----|----|----|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**23** Available   **21** Unavailable   **22** Today   **23** Selected dates

## Location



USA  ›  Texas  ›  Hill Country  ›  Lake Travis  ›  Point Venture

| **Nearest Airport** | 48 Miles |
|---|---|
| Austin-Bergstrom International Airport | |

| **Nearest Barpub** | 1 Miles |
|---|---|
| The Gnarly Gar | |

Feedback

| **Nearest Golf**<br>Point Venture Golf Club | 0.5 Miles |
|---|---|

| **Nearest Motorway**<br>Highway 183 | 18 Miles |
|---|---|

| **Nearest Restaurant**<br>The Gnarly Gar | 1 Miles |
|---|---|

| **Nearest Beach**<br>Point Venture Park Beach | 0.25 Miles |
|---|---|

**Car:** Necessary

Village of Point Venture is a peninsula on Lake Travis. The Gnarly Gar is a floating restaurant located within Point Venture approximately 1 mile from the house. Winery tours are available at Flat Creek Estate Wineries located 17 miles from the house off Singleton Rd.

# Owner info



**Year Purchased:** 2002

**About the owner:** We are Texans and love Lake Travis. We have been making memories on Lake Travis for over 30 years. We think this is heaven on earth!

**Why the Owner Chose Point Venture, TX, USA:**
We built this house in 2002 on land that has been in the family for 40 years. The house was designed with the idea of being together and enjoying the views.

**The Unique Benefits at this House:**
The house was designed to have a view of the lake from just about any place in the house. Our most favorite spot is the deck. We gather on the deck on the double chase or hang out in the hot tub and tell stories for hours. Fireside chats with a glass of wine with good friends is another favorite.

## Contact us

**Speaks:** English, Spanish
**Response time:** Within an hour
**Response Rate:** 100%
**Calendar last updated:** 03/06/2017

Send email

## Links to more information:

CLICK HERE - Lake Travis Rent House

CLICK HERE - Point Venture Golf Club on Lake Travis

CLICK HERE - The Gnarly Gar Restaurant

CLICK HERE - Water Craft Rentals

**Guestbook comments from the owner**

Feedback

What an awesome place! Beautiful deck and open living area for hanging out with the group, and plenty of private space to escape for some quiet time. Perfect place to get away from it all and make some great memories with friends or family!

Nancy L.

**1 of 4**  ⟨ ⟩

## Photos

Full Lake Travis

1700 square foot deck with hot tub and views of Lake Travis.

Sunset on the deck.

Lake view from the Living Room windows.

Open concept dining room and kitchen with large island.

Double Bedroom located on the first floor. Driveway level.

View of the back of the house from the garden doors.

Master bedroom with views of Lake Travis. King size bed and flat screen TV.

Apartment living and dining room with separate entrance from the upstairs deck.

Upstairs balcony with a view through the double doors.

Queen size bedroom in apartment.

Hot tub with view of the lake.

Front of the house with circular drive that can accommodate 6 cars.

Stairs leading from the main deck to the fireplace.

Living Room with 42" Plasma screen TV.

Fully stocked kitchen with microwave, oven, refrigerator and dishwasher.

Bedroom downstairs with access to the deck and hot tub.

Gate to the secret garden.

Movie Room with 65" screen TV. Trundle bed sleeps 2.

Kitchen upstairs in the apartment with full size refrigerator and microwave.

Queen size bedroom in attached apartment.

Point Venture swimming pool.

Point Venture Private Park boat ramp access.

Sunset on Lake Travis

## Partner Offers

Feedback

**Car rentals – Search, Compare & Save**

Pick up location     Q

Drop off location     Q

Pick up Date        Drop off Date

10   ⌄    30   ⌄      10   ⌄    30   ⌄

Driver's age ?

Search

Feedback

STATE OF TEXAS     )

COUNTY OF TRAVIS    )

I, Cathy Mata, Official Court Reporter in and for the County Court at Law No. 1 of Travis County, State of Texas, do hereby certify that the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's Record is $651.20 and was paid/will be paid by Mr. James Patrick Sutton.

WITNESS MY OFFICIAL HAND this the 3rd day of May, 2017.


   /s/ Cathy Mata
Cathy Mata, Texas CSR No. 6126
Expiration Date:  12/31/17
Official Court Reporter, County Court at Law No. 1
Travis County, Texas
P.O. Box 1748, Austin, Texas 78767
Telephone (512) 854-9252



Tab F

CAUSE NO. C-1-CV-17-001833

| RICHARD W. JACKSON, | § | IN THE COUNTY COURT |
| LISA C. JACKSON, and | § | |
| KATHLEEN WOODALL, | § | |
| Plaintiffs, | § | |
| vs. | § | AT LAW NUMBER TWO OF |
| | § | |
| JANICE COX and HELEN RAMSEY, | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## DEFENDANTS JANICE COX AND HELEN RAMSEY'S
## FIRST AMENDED ANSWER AND SECOND AMENDED COUNTERCLAIM

Defendants Janice Cox and Helen Ramsey (hereinafter "Defendants") file their First Amended Answer and Second Amended Counterclaim, and respectfully show the Court as follows:

## GENERAL DENIAL

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every allegation in Plaintiffs' Petition (the "Petition") and demand strict proof of all matters set forth therein. Defendants specifically reserve the right to file amended pleadings in this case in accordance with the Texas Rules of Civil Procedures and applicable orders of the Court.

## DEFENSES

1.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

2.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel, including the doctrine of equitable estoppel.

Wherefore, Defendants respectfully request that (1) Plaintiffs take nothing by way of their claims, (2) Defendants receive their costs of court, expenses, and attorneys' fees expended in this action; and (3) Defendants receive any further relief, at law or in equity, to which they may be justly entitled.

## COUNTERCLAIMS

### I.      FACTUAL BACKGROUND

1.      Ms. Cox and Ms. Ramsey live in a residential neighborhood of Point Venture Section 3-1, Texas ("Point Venture"). The properties in Point Venture are governed by the 1972 Restrictions that are recorded at Volume 4291 Page 1452, *et seq.* in the Official Records of Travis County ("1972 Restrictions"). Ms. Cox and Ms. Ramsey moved to Point Venture for the quiet and family oriented lifestyle the community offered. However, as transient rentals have become more common in Point Venture, the quiet has been replaced with constant interference with and disrespect for their rights as property owners and their enjoyment of their home.

2.      The Jacksons own a house adjacent to Ms. Cox and Ms. Ramsey. The Jacksons continually rent out their house as a party house for transient housing. The Jackson's transient renters have committed the following acts:

- Transient renters urinating and vomiting in front of their family;

- Being chased by transient renters on foot, late at night;

- Observing weekend parties with over thirty (30) guests playing music, singing karaoke and dancing on the roof of the Jacksons' house in the late night and early morning hours;

- Transient renters throwing trash and beer cans onto their property;

- Transient renters trespassing onto their property;

- Persons entering onto their property from the Jacksons' property and damaging it; and

- Intoxicated transient renters harassing both Ms. Cox and Ms. Ramsey on their own property on multiple occasions.

2

Ms. Cox and Ms. Ramsey attempted to resolve the matter amicably by speaking with the Plaintiffs and other Point Venture neighbors directly. Ms. Cox and Ms. Ramsey were met with hostility, retaliation, and threats. The nuisance created by the Jacksons continued even after Ms. Cox and Ms. Ramsey attempted to resolve the issue.

3.    Previously, Kathleen Woodall opposed the operation of transient rentals in Point Venture. At a Village Council meeting on October 7, 2015, Ms. Woodall expressed concern regarding rental properties. Specifically, she suggested that the Village Council register rentals, limit occupancy and cars, and implement cleaning requirements and a code of conduct. She also expressed "VRBO's are causing Property Values to decrease." Ms. Woodall distributed a handout outlining her concerns and suggestions. At a Village Council meeting on March 10, 2016, Ms. Cox and Ms. Ramsey were present when Ms. Woodall told the Mayor she felt "there should be an ordinance regulating the short-term rentals." Ms. Woodall also sent out two e-mails in late 2015 and early 2016 discussing her on-going suggestions to regulate transient rentals through written ordinances. Subsequently, Ms. Woodall began making her property available as a transient rental and, conveniently her position on transient rentals changed.

## II.    COUNTERCLAIM:  DECLARATORY JUDGMENT

4.    The allegations in the preceding paragraphs are incorporated herein by reference.

5.    There is a real and substantial justiciable controversy between the parties. Defendants contend that Article I, ¶ 4 provides for the owners of a majority of lots in the subdivision to have the power and authority to change the provisions of the 1972 Restrictions, in whole or in part, by the execution and recordation of an instrument so changing the 1972 Restrictions. Plaintiffs incorrectly contend that Article I, ¶ 4 requires 30 days' written notice in

3

writing to all lot owners and the prior recommendation from the Architectural Control Authority before execution and recordation of the changing instrument.

6. Defendants seek a declaration that the 1972 Restrictions do not require that an Article I, ¶ 4 changing instrument have 30 days' written notice or an Architectural Control Authority recommendation before its execution and recordation.

### III. COUNTERCLAIM: BREACH OF CONTRACT

7. The allegations in the preceding paragraphs are incorporated herein by reference.

8. The 1972 Restrictions prohibit Plaintiffs from: (1) renting any of the improvements on their lot without the prior written consent of the Developer; (2) using a lot for any commercial, business, professional or church purpose; (3) using a lot for anything other than a single-family, private residential purpose; (4) using a lot for anything other than single family residential purposes; and (5) allowing noxious or offensive activity of any sort on their lot or allowing anything to be done on their lot which may be or become an annoyance or nuisance to the neighborhood.

9. Plaintiffs have breached the 1972 Restrictions. As a result of Plaintiffs' breaches of contract, Defendants have been damaged in an amount within the jurisdiction of this Court.

10. All conditions precedent have been satisfied.

### IV. COUNTERCLAIM: INVASION OF INTEREST IN PRIVATE ENJOYMENT OF PROPRTY/NUISANCE (Jacksons only)

11. The allegations in the preceding paragraphs are incorporated herein by reference.

12. Ms. Cox and Ms. Ramsey have a right to use and enjoy their home. Plaintiffs have substantially interfered with their interest and right to use and enjoy their home. Plaintiffs' actions constitute a nuisance.

4

13. Plaintiffs' actions are negligent or intentional. As a result, Defendants have been damaged in an amount within the jurisdiction of this Court.

## V. COUNTERCLAIM: WRONGFUL INJUNCTION

14. The allegations in the preceding paragraphs are incorporated herein by reference.

15. Pursuant to Article I, Section 4 of the 1972 Restrictions, Defendants were attempting to change the 1972 Restrictions to prohibit rentals for less than ninety days. This change would have put Plaintiffs out of the business of transient rentals.

16. Although one of the Plaintiffs testified at the temporary injunction hearing, Plaintiffs failed to inform the Court that one of the Plaintiffs had sent a letter and a flyer opposing the change to everyone in Point Venture Section 3-1. Everyone, except for the probable and notable exceptions of Ms. Cox and Ms. Ramsey received the letter and flyer. Plaintiffs' mailing included the change to the 1972 Restrictions. The letter and flyer opposing the change was sent out on February 2, 2017.

17. Plaintiffs' opposition did not work - It was clear that the will of the people was to stop the nuisances created by the transient rental business. Plaintiffs realized that the money from their $900-plus nightly rental incomes was about to end. That is when Plaintiffs filed this lawsuit - three weeks after sending out the letter and flyer to try and stop people from signing the change to the 1972 Restrictions.

18. Previously, Plaintiffs obtained a temporary restraining order and temporary injunction to prevent the change and protect their business. In both instances, Plaintiffs' sole complaint was that Defendants failed to meet the (1) notice and (2) ACC approval requirements in Article IX of the 1972 Restrictions. Because Defendants were following the procedure in Article I, Section 4 of the 1972 Restrictions – which does not include these requirements and has different

5

requirement – Plaintiffs argued that the requirements in Article IX of the 1972 Restrictions should be copied and pasted into Article I, Section 4 of the 1972 Restrictions. Plaintiffs made this complaint while admitting (1) Article IX is a "standalone" amendment provision while (2) Article I, Section 4 is a "separate" provision that allows a "majority of owners to amend the deed restrictions upon the 35th anniversary of their adoption and every ten years thereafter."

19.     On November 17, 2017, the Court denied Plaintiffs' motion for partial summary judgment concerning this issue and granted Defendants' motion for partial summary judgment on this same issue.

20.     The temporary restraining order and temporary injunction were issued or perpetuated when they should not have been. On information and belief, the temporary injunction will be dissolved.

21.     As a result of Plaintiffs' obtaining the temporary injunction, Defendants have been injured and seek recovery for such injury. Furthermore, Defendants ask that the Court award Defendants additional damages in the amount of the temporary restraining and temporary injunction bond or otherwise rule that the bond be recovered by Defendants. Finally, if the Court deems it necessary, Defendants request equitable or other relief in the form of time to file the change to the 1972 Restrictions or some other form to cure any harm caused to Defendants.

## VI.     REQUEST FOR PERMANENT INJUNCTION

22.     The allegations in the preceding paragraphs are incorporated herein by reference.

23.     Defendants seek a permanent injunction against the Jackson's continued operation of their property for their transient rental business.

## VII.  REQUEST FOR ATTORNEYS' FEES, INTEREST, AND COSTS

24.     Pursuant to Texas law, Chapter 38 of the Texas Civil Practice and Remedies Code and Section 5.006 of the Texas Property Code, Defendants seek to recover their reasonable attorneys' fees and costs, including reasonable fees for the cost of successfully making or responding to an appeal to the court of appeals and the Texas Supreme Court.  All conditions precedent for the recovery of attorneys' fees have been met.

25.     Defendants are also entitled to his costs incurred in this action pursuant to Rule 131 of the Texas Rules of Civil Procedure.

26.     Furthermore, Defendants request that they be awarded prejudgment and post-judgment interest to which they are entitled under the law.

## VIII.   CLAIMS FOR RELIEF

27.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Defendants are seeking monetary relief over $100,000 but not more than $200,000 and non-monetary relief.

## IX.     JURY DEMAND

28.     Defendants have requested a trial by jury and paid the requested fee.

## X.  PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request the following relief:

(1)     that this matter be set down for trial by jury;

(2)     that the Court grant a declaration that the 1972 Restrictions do not require that an Article I, ¶ 4 changing instrument have 30 days' written notice or an Architectural Control Authority recommendation before its execution and recordation;

(3)     that the Court grant Defendants' application for a permanent injunction prohibiting Plaintiffs from using their lot for a transient rental business;

(4)     that the Court award Defendants all damages they have sustained as a result of Plaintiffs' conduct;

(5)     that the Court award Defendants additional damages in the amount of the temporary restraining and temporary injunction bond or otherwise rule that the bond be recovered by Defendants;

(6)     that the Court award Defendants additional damages in the amount of the temporary restraining and temporary injunction bond or otherwise rule that the bond be recovered by Defendants;

(7)     that, if the Court deems it necessary, the Court award Defendants equitable or other relief in the form of additional time to file the change to the 1972 Restrictions or some other form to cure any harm caused to Defendants.

(8)     that the Court award prejudgment and post-judgment interest;

(9)     that the Court award Defendants their reasonable attorneys' fees as permitted by law, including reasonable fees for the cost of successfully making or responding to an appeal to the court of appeals and the Texas Supreme Court;

(10)    that the Court award Defendants their costs, including costs of court; and

(11)    for all such other relief, at equity or otherwise, to which Defendants may show themselves entitled.

Respectfully submitted,

/s/ Michael L. Navarre
Michael L. Navarre
State Bar No. 00792711
BEATTY BANGLE STRAMA, PC
400 West 15th Street, Suite 1450
Austin, Texas  78701
(512) 879-5050  Telephone
(512) 879-5040  Facsimile
mnavarre@bbsfirm.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was electronically served on counsel of record by email on this 1st day of December, 2017:

James Patrick Sutton – via jpatricksutton@jpatricksuttonlaw.com
The Law Office of J. Patrick Sutton
1706 W. 10th St.
Austin, Texas  78701

Mr. David M. Gottfried – via david.gottfried@thegottfriedfirm.com
The Gottfried Firm
West Sixth Place
1505 West Sixth Street
Austin, Texas 78703

/s/ Michael L. Navarre
Michael L. Navarre